Lenore **DIETZ** and William Dietz, individually and on behalf of James Dietz, an infant, Plaintiffs,

v.

Harold **DAMAS**, individually and as caseworker, Child Welfare Administration, Marcia Lewis, individually and as supervisor, Child Welfare Administration, Daniel Elmore, individually and as supervisor, Child Welfare Administration, William J. Grinker, individually and as Commissioner of Social Services of the City of New York, Brooke Trent, individually and as Deputy Commissioner of Social Services of the City of New York, City of New York, and Diane McGurn, Defendants.

Civil Action No. CV–91–5016 (DGT).

United States District Court, E.D. New York.

July 11, 1996.

Carolyn A. Kubitschek, Lansner & Kubitschek, New York City, for Plaintiffs Lenore Dietz and William Dietz.

Paul A. Crotty, Corporation Counsel of the City of New York (Diana M. Murray, of Counsel), New York City, for Defendants Harold Damas, Daniel Elmore, Marcia Lewis, William J. Grinker, Brooke Trent and City of New York.

Robert J. Poblete, Pellini & Poblete, New York City, for Defendant and Counter-claimant Diana McGurn.

### REVISED MEMORANDUM AND ORDER

TRAGER, District Judge:

This case presents the difficult dilemma faced by child protection workers, aptly characterized by the Second Circuit, in *van Emrik v. Chemung County*, 911 F.2d 863, 866 (1990) (Newman, C.J.), in the following language: "If [protective services caseworkers] err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights." *See also Defore v. Premore*, 86 F.3d 48, 49 (2d Cir.1996) (citing *van Emrik*) ("Once again we confront a case in which publicly employed social workers are obliged to make the difficult choice between taking action to protect a child, thereby risking violation of the parents' rights, and declining to at, thereby risking violation of the child's rights.") In this case the child protection workers, when faced with just this dilemma—under circumstances that almost certainly were the result of abuse that left an infant blind—chose to intervene and interfere with the parents' rights in the belief that one of the parents may well have been responsible for the child's injury. That decision, it turns out, may have been wrong and has brought upon them a lawsuit seeking substantial damages. But, as unfortunate as the situation is, in a world in which child protective workers can not be expected to be omniscient, this court finds it hard to fault these workers. Indeed, under the facts here, if the modest restrictions placed on the parents' rights were improper, it is hard to conceive how an effective system of child protection can be maintained.

Thus, the claim in this case is a marked contrast to the usual situation where the Child Welfare Administration (CWA),[1] the City agency responsible for monitoring abused children, is condemned for inaction in the face of reported abuse or for the return of a child to its natural parents despite the agency's knowledge or suspicion of prior abuse of the child.[2] To the contrary, neither the child's parents nor the babysitter—the only persons in contact with the child during the period when the injury occurred—had any prior history of violent or abusive conduct. The record indicates that they were caring, responsible individuals. Thus, CWA is now accused of violating the constitutional rights of parents and their child by *taking* custody of the child, allegedly without probable cause, by its refusal to return a child to his parents' custody without restrictions, and by its failure to seek immediate court approval for its actions.

---

**1.** Although the Child Welfare Agency, part of the Human Resources Administration, was responsible for investigation of child abuse when this suit was filed, its predecessor, Special Services for Children (SSC), was the agency involved at the time of James Dietz' injury. In 1996, as this decision is written, a new agency, outside of the Human Resources Administration, has been established to respond to child abuse reports. *See infra* n. 2.

**2.** Recently there have been a number of highly publicized cases when a child had died or been seriously injured despite CWA's involvement with the child. *See, e.g.,* N.Y.Times, January 12, 1996, p. A1 and February 28, 1996, p. B1, 4.

The injury to the child occurred on December 20, 1988, when he, then six months old, was blinded by being shaken violently. The child was hospitalized on the date of the incident, and the hospital, at the treating physician's direction, filed a report of abuse with the State Child Abuse and Maltreatment Register. Without seeking a court order, on Friday, December 23, 1988, the day after the initial report of abuse was received by CWA, after an evening visit with the parents and the grandparents in the grandparents' home, the CWA caseworker arranged for the child's release from the hospital over the Christmas weekend to his maternal grandparents with the parents given complete access to him, subject only to supervision by the maternal grandparents.[3] During the following week, after the child was readmitted to the hospital on Wednesday, December 28th, for further treatment, CWA notified Mr. and Mrs. Dietz that it would seek court approval to restrict the parents' custody of the child and brought a petition to Family Court on Tuesday, January 3, 1989, the beginning of the following week. Until March 1989, the Dietzes were suspects in their child's abuse.

Criminal charges were subsequently brought against the child's babysitter in September 1989, but that indictment was dismissed in March 1991. A second grand jury refused to issue an indictment. The babysitter, Diane McGurn, is a defendant in this action, on a pendent state claim, and has interposed counterclaims for defamation and malicious prosecution against plaintiffs.

**3.** The first day Family Court would have been open to receive such a petition after the CWA caseworker's meeting with Mr. and Mrs. Dietz was Tuesday, December 27, 1988.

**4.** Because of the City's repeated motions for summary judgment, the parties have submitted a number of briefs, affidavits, documentary evidence and depositions that have been considered in this opinion. With only minor exceptions, the parties have numbered their exhibits consecutively and thus, in the interest of minimizing the length of citations, the exhibits will be referred to, (with the exception noted below), as [Party] Ex. ——, without further indication of the documents to which they are attached.

City Exhibits A–S were submitted in a volume labeled Exhibits August 5, 1992. City Exhibits T–U were attached to its motion for summary

The City of New York (City), defendant, and the individual City defendants have moved for summary judgment on grounds that the actions of the City's agents, the individual City defendants, did not violate any constitutional rights of the plaintiffs and were, further, duly authorized under New York State law. In the alternative, the City individual defendants have moved for summary judgment in their personal capacities on the basis of qualified and absolute immunity. As a third alternative, the City offered plaintiffs $1.25 in damages as the full monetary value of any violation of procedural due process rights they may have suffered.

### Background

### (1)

Plaintiffs in this case are James Dietz and his parents, William and Lenore Dietz. It is undisputed that on the morning of December 20, 1988, James, then six months old, was shaken violently by an adult, and, as a result, James suffered massive hemorrhages in his skull which left him blind. No witnesses to this shaking have been identified. The finding that James' injuries were intentionally inflicted as the result of shaking by an adult was made by physicians based on James' symptomatology and medical tests, all indicating that James suffered Whiplash Shaken Infant Syndrome (WSIS). The shaking had to be vigorous and "to have to be at least a minute or longer" in duration. *See* Giridharan at 13, 17–23, City Ex. F., McHugh Ltr., City Ex. O.[4]

judgment submitted July 31, 1992. City Exhibits AA, BB and C (sic) were attached to the Murray Affidavit dated February 14, 1994. The exceptions in which there were duplicate numbering on exhibits are, first and most importantly, the City's duplicate Exhibits A–E, submitted with the Murray Affidavit dated March 31, 1995, whose location will be specified as such, and, secondly and less importantly, the City's one Exhibit AA and Exhibit C, attached to its August 2, 1995 Reply Affidavit and its duplicate Exhibit AA, attached to its February 14, 1994 Affidavit in support of its motion for summary judgment. The Exhibit AA attached to the February 14, 1994 papers concerned permission to move for summary judgment and has not been cited to herein. The City's original Exhibit C is defendant McGurn's answer and counterclaim and its later Exhibit C (CC) is an affidavit by Edward Parker dated February 14, 1994.

James first manifested symptoms of distress about 10:30 on the morning of December 20, 1988, at the home of his babysitter, Diane McGurn. His mother, Lenore Dietz, dropped James off at his babysitter's home between 7:00 and 7:30 a.m. on Tuesday, December 20, 1988. His father, William Dietz left for work at 6:30 a.m.

James had been seriously ill for several days prior to December 20, 1988, with symptoms including vomiting and listlessness. In the early morning hours of Saturday, December 17, Mrs. Dietz called James' pediatrician at 1:30 a.m. and 3:00 a.m. and then again at 9:00 a.m. Mrs. Dietz stayed home for two days, Friday and Monday, because of James' illness. She was employed as director of merchandising for a jewelry company. Although James was better on Sunday, December 18, 1988, Mrs. Dietz stayed home on Monday to be sure of his recovery. She had taken James to his pediatrician when he was first ill and called the pediatrician six times during James' illness. She was up all night with him on Saturday, December 17, 1988. Mrs. Dietz stated that she and James woke at about 6:15 a.m. on Tuesday, December 20, 1988, and arrived at the babysitter about 7:15 a.m. L. Dietz Notes, Murray Reply Aff. dated August 2, 1995, Ex. AA. In her deposition in 1992, Dr. Giridharan, the neurologist who treated James at Brookdale Hospital, dismissed the suggestion that James' injury was a continuation of his prior illness. Giridharan at 15–16, City Ex. G.

Mrs. McGurn reported that James was a little cranky when Mrs. Dietz brought him to her on December 20, 1988 about 7:15 a.m. She told Damas that Mrs. Dietz had "carried [James] like a football underarm." Damas case notes, City Ex. I at 6. (Later the ambulance attendants had to walk up to Mrs. McGurn's sixth floor apartment because the elevator was not working when they arrived. McGurn Police Interview, Pltf. Ex. A. However, there is no evidence that the elevator was not working when Mrs. Dietz arrived with James.) Mrs. McGurn reported that, after he arrived, James drank a bottle and then fell asleep. *Id.* and Damas case notes at 7.

Later James awoke and Mrs. McGurn offered him more milk. There is an inconsistency in the records as to the amount of milk James took at this time. This discrepancy would later become critical to a determination of the time of abuse, but no evidence was presented that Mrs. McGurn or anyone else perceived that this was so in December 1988 when Mrs. McGurn was questioned about this subject. Detective Diggs, who conducted the police investigation of the abuse incident, noted that on December 22, 1988 Mrs. McGurn told him that James took seven ounces. While Mrs. McGurn was giving (or attempting to give) the second bottle to James he became stiff and made "funny sounds." Pltf. Ex. A. In contrast, Damas' case notes of his December 27, 1988 conversation with Mrs. McGurn state that she said only that she had tried to feed the child again. Damas case notes, City Ex. I. Damas stated at his deposition that Mrs. McGurn said that when she attempted to give him a second bottle, James had "started to get stiff, writhing like a snake." Damas I at 99–101, City Ex. H.

When Mrs. McGurn observed James' distress, she called a private ambulance service directly and it came three minutes later. The ambulance records show that the call came at 10:33 a.m., the ambulance arrived at Mrs. McGurn's building at 10:36 a.m. and at Lutheran Hospital at 10:47 a.m. Because of the severity of James' condition, the ambulance attendants took James without waiting for McGurn to dress and obtain care for the other two children in her apartment. Police Interviews of Mrs. McGurn, Mr. Dietz, Bravo

Plaintiff submitted Exhibits A–L plus seven depositions (Lewis, Vitelli, Parker I & II, Elmore I & II and Damas II) as part of its 3(g) statement November 18, 1993. A duplicate-numbered Plaintiffs' Exhibit A was submitted as an attachment to the Kubitschek declaration dated July 8, 1994 and duplicate Exhibits A–F were submitted on June 15, 1995. None of plaintiffs' duplicate exhibits have been used in this decision. The June 15, 1995 exhibits were procedural correspondence and duplicates of earlier legal submissions. The July 8, 1994 Exhibit A is a partial copy of the *CWA* Child Protective Services Field Operations Manual. As the name of the agency at the time of this incident was CWA's precursor, Special Services for Children (SSC), the applicability of the manual here is not clear.

Ambulance official Kelly, Mrs. Byrne (neighbor who took care of children while McGurn at hospital), Pltf. Ex. A.

After getting a neighbor to care for the other children, Mrs. McGurn phoned Mrs. Dietz at her place of employment and then took a taxi to the Lutheran Hospital. It is not clear whether Mrs. McGurn gave any information about James to the medical staff at Lutheran Hospital. After a while Mrs. Dietz arrived with a man who, Mrs. McGurn later learned, was Mrs. Dietz' boss. When, later, James was to be transferred to another hospital, Mrs. Dietz' sister Diane gave Mrs. McGurn a ride home. *Id.*

As noted, James was brought to Lutheran Hospital in late morning on December 20, 1988, but, later that same day, he was transferred to Brookdale Hospital. Two days after James' admission, on December 22, 1988, Brookdale Hospital notified the State Central Child Abuse and Maltreatment Register, using the 2221 report form, that James was a victim of child abuse, indicating that Mr. and Mrs. Dietz were suspected. City Ex. J. During her deposition, Dr. Giridharan acknowledged that it was she who, on December 21, 1988, directed hospital staff to initiate a child abuse report about James' condition. Giridharan at 22, City Ex. G.

The initial child abuse report from Brookdale Hospital clearly overstated the case against Mr. and Mrs. Dietz by stating that "parents did not bring child to emergency room until 8:00 p.m. that same evening." The report also included the statement: "mother's apparent lack of bonding to the baby ie very distanced." City Ex. J. The CWA caseworker assigned, Harold Damas, testified: "I didn't even pay attention to that [initial child abuse report], really," noting that such reports frequently contain inaccuracies. Damas I at 55, City Ex. H. Upon questioning by Damas, the person who made the report for Brookdale admitted she was unaware of James' initial hospitalization in

the morning at Lutheran hospital.[5] Damas case notes at 8, City Ex. I.

The State Central Register then sent a copy of the 2221 report of abuse to CWA the same day it received it, December 22, 1988. CWA assigned Damas to investigate the case. Daniel Elmore was Damas' supervisor from December 22, 1988 through January 3, 1989, when the city filed a child abuse petition against Mr. and Mrs. Dietz in Family Court. After January 3, 1989, Damas was promoted to a supervisory position and transferred to another unit, where he was supervised by Marcia Lewis. Damas retained the Dietz case after his promotion and transfer. Damas, Elmore, and Lewis, along with then-HRA Commissioner Grinker and Deputy Commissioner Trent (who do not actually figure in these events) are all named defendants, and will be referred to as the "City individual defendants."

After its receipt of the child abuse report from the State Register, on December 22, 1988, Dr. Grillo, the resident who was treating James at Brookdale Hospital, confirmed to Damas the diagnosis of Whiplash Shaken Infant Syndrome. Damas recorded in his notes that "Dr. Grillo said that he did not know anything. He would not guess as to who did this." CWA told Dr. Grillo to place a "hold" on James that required the hospital to keep James after he was deemed to be medically dischargeable. Damas also noted that Dr. Grillo stated that "he had utmost confidence in [the grandparents]." Damas case notes, City Ex. I. CWA wanted time to investigate the case before James was released to his parents.

Damas tried to see Mr. and Mrs. Dietz on December 22, 1988 at their home. Although unsuccessful in his attempt, he left a W555C notice at their front door which notified them that they were named as subjects in a report of child abuse. The notice also informed them of their rights to request amendment or expungement if the report were found to

---

5. Although Damas rapidly became aware of the overstatements this initial report contained, its allegations were repeated in the petition presented to Family Court. For reasons that are unclear, Damas was not the caseworker who assisted in preparation of the petition. The caseworker and the attorney who prepared the petition were unaware of the inaccuracies. Parker Aff. attached as Ex. C to Murray Aff. dated February 14, 1994.

be "indicated" [6] (i.e., substantiated), and provided Damas' name and telephone number. Damas I at 50–60, 65–72, City Ex. H, W–555C attached as City Ex. K.

On December 23, 1988, Damas met with Mr. and Mrs. Dietz and Mrs. Dietz' parents, the Salmos, at the Salmos' home. Damas stated that he thought he went to the Salmos' home because they had called him, in response to the W555–C. Damas I at 75, City Ex. H. Damas received calls from Mr. and Mrs. Dietz and Mr. Salmo asking him to conduct the interview on December 23, 1988 rather than waiting until December 27, 1988, which would have been after the Christmas holiday. Mrs. Dietz acknowledged that one of her parents had suggested, in a phone conversation with Damas, that they could undertake to supervise James' contact with his parents. This was the reason that the home visit was conducted at the Salmo residence. L. Dietz at 19, City Ex. D, attached to Murray Aff. dated March 31, 1995. Mr. Damas refers to the concern of Mr. Elmore, his supervisor, that they lacked medical information sufficient to determine whether James could be released to his parents but had stated that it might be possible to discharge him to his grandparents if they were not listed in the Child Abuse Register, the home visit was favorable, and the Salmos and Dietzes agreed to CWA's conditions. Damas I at 76, 86, City Ex. H.

Damas conducted his interview with Mr. and Mrs. Dietz and Mr. and Mrs. Salmo, all together, at the Salmos' home. Damas noted that Mrs. Dietz, while Mr. Dietz was speaking, "went to the kitchen and stayed there for a few seconds, running her fingers through her hair and returned to living room." Damas case notes, City Ex. I.

The City claims that it was agreed by everyone that James would be released to the Salmos, and that the parents could stay with James, subject to the grandparents' supervision. In her deposition, Mrs. Dietz stated that the arrangement to place James in the custody of her parents was arranged "out of desperation," at the suggestion of her father, because "Mr. Damas told [her] that the baby was not going to be released to our care." L. Dietz Dep. at 18, City Ex. D, attached to Murray Aff. dated March 31, 1995.

Damas recalled that the Dietzes "really didn't have any objection to James going there." Damas I at 80, City Ex. H. Mrs. Dietz acknowledged that the family was very concerned about the approaching Christmas holiday. "We were very concerned with coming home with James for Christmas." L. Dietz Dep. at 20, City Ex. D attached to Murray Aff. dated March 31, 1995. Damas, after talking with the Salmos and Dietzes and inspecting the Salmos' home, gave the Salmos a letter that would authorize the hospital to release James to them. Damas also recorded in his notes of this meeting that he requested "that they [Salmos and Dietzes, presumably] should keep him inform (sic) of any changes that child was going through." Damas case notes, City Ex. I.

James was released to his grandparents on Saturday, December 24, 1988. The Salmos and Mr. and Mrs. Dietz had a very close relationship. The Salmos were at both Lutheran and Brookdale Hospital with Mr. and Mrs. Dietz. Mr. Salmo had contacted Damas on Mr. and Mrs. Dietz' behalf. Mr. and Mrs. Dietz had planned to spend the Christmas holidays with the Salmos prior to James' injury. L. Dietz at 18, City Ex. D, attached to Murray Aff. dated March 31, 1995. Mr. and Mrs. Salmo took care of James for one week when he was two months old and Mrs. Dietz went to the Orient on business. During the Salmos' care for James at that earlier time, Mr. Dietz visited daily but did not stay over-night with James. *Id.* at 36. During James' second hospitalization, Mr. and Mrs. Dietz continued to stay at the Salmos' house. *Id.* at 30.

James returned to Brookdale Hospital for a prearranged follow-up appointment with Dr. Giridharan on December 26, 1988, at which time an appointment was made for his readmission to the hospital on December 28, 1988, to treat the symptoms identified, in-

---

6. "Indicated" is the term used when "some credible evidence has been found to support the determination that your child(ren) has/have been maltreated or abused." W–555D attached as City Ex. Q.

cluding his bulging fontanel. (The fontanel is the soft spot on a baby's head, where the skull has not yet formed a single bony mass.) Giridharan Rpt. dated January 11, 1989, City Ex. BB, attached to Murray Aff. dated February 14, 1994. These symptoms required a second and, ultimately, a third spinal tap (lumbar puncture). Dietz at 26–27, Giridharan Rpt. dated January 11, 1989, City Ex. BB, attached to Murray Aff. dated February 14, 1994.

(2)

On December 28, 1988, Damas learned of James' readmission to Brookdale Hospital from the Brookdale staff member who was also the source for the original report of abuse and its errors. (Based on Damas' notes and testimony, neither the Dietzes nor the Salmos appear to have notified CWA about James' readmission to the hospital nor the reasons for it. Damas called Mr. Salmo and told him again, as he had on December 23, 1988, to keep him informed.) This Brookdale Hospital staff-member told Damas that James had not been medically ready for discharge on December 24, 1988 and that the parents had been less concerned with James' condition than with obtaining his release for the holidays. This staff-member also stated that she found Mrs. Dietz somewhat distant when she questioned her, and that Mrs. Dietz had said that Mrs. McGurn was very good with James. Damas case notes, City Ex. I. On Damas' questioning, this staff-member acknowledged that she had not known that James' admission to Brookdale had been as a transfer from Lutheran Hospital. *Id.*

Also, on December 28, 1988, Damas spoke to Detective Diggs who informed him "that he was unable to determine who committed this act against child. [Diggs] said that he could not establish any time frame as to when incident happened. . . . [Diggs] said he had no proof that that babysitter did anything to child. . . . [Diggs] said that he went around and questioned a few people. They only had high praise for Mrs. McGurn." *Id.*

Damas attempted to reach Dr. Giridharan, the treating physician, without success on December 29, 1988. Damas case notes, City Ex. I. On December 30, 1988, Damas spoke to Dr. Giridharan, but despite Damas' pointed questioning, she refused to pinpoint the time of occurrence. Damas I at 124–130, 133–35, City Ex. H, Giridharan at 5–6, City Ex. F. Damas testified at his deposition: "The case solely depended on Dr. Giridharan's statement, nothing else. It was 'When did it happen? When did that person shake James?' That's the whole basis for the case." Damas I at 130, City Ex. H.

Detective Diggs had interviewed Dr. Giridharan on December 22, 1988. His report also noted Dr. Giridharan's refusal to limit the time in a way that would exclude Mr. and Mrs. Dietz from suspicion: "The Doctor [Giridharan] said it had to of [sic] happened on that day Tuesday but she could not give a time." Giridharan Police Interview, Pltf. Ex. A.

Dr. Giridharan's deposition testimony also confirms Damas' account: "[E]arly in the conversation I had pointed out to Mr. Damas that my role is to take care of the medical aspects and that I would leave the investigations up to him. Not wanting to be specific, I wanted to say 'few' [hours before the symptoms became manifest]." Giridharan at 5, City Ex. F. Also: "[Damas] asked me [to be more specific as to a time frame] and I repeated I could not be specific." *Id.* at 26. Q: "Did Mr. Damas inform you of the importance of establishing a time frame during this conversation?" A: "Of course." Q: "And still based on that you would not give him a time frame?" A: "No." *Id.* at 28–29.

On December 29, 1988, Elmore, Damas' supervisor, noted calls from Ms. Angela Christofidef of the Neighborhood Stabilization Board, a division of the City Human Rights Commission, from Mr. Fred Molloy of Councilman Sal Albanese's office, and from Mr. Salmo, all expressing concern about the continuing suspicion of the Dietzes. Elmore also received a call from Detective Diggs, who reported that the same people had called him. Elmore case notes, Pltf. Ex. J.

Damas' notes indicate that CWA's second "hold" was placed on December 30, 1988. Damas' notes record a conference with Elmore and Mr. Fenton, the Zone Director, at which Fenton directed that a petition should

be filed and that the "child should not be returned to grands. He said to let the judge make the decision." There is a reference to Fenton having contact with "Dr. Margaret McCue [7] from Bellevue Hosp. who's an expert in the field of pediatrics and is also regarded as an expert in ct. Dr. McCue wanted to know the estimation of blood in brain." There is also a notation that Fenton wanted the diagnosis changed to Battered Child Syndrome. However, Damas' notes continue that when Elmore called Dr. Giridharan, she refused to change the diagnosis. Damas case notes at 10–11, City Ex. I.

### (3)

Although the complaint, ¶ 30, states that James was ready for medical discharge only on January 3, 1989, Mrs. Dietz' notes, provided at her deposition, indicate that James received medical clearance for discharge on December 31, 1988, a Saturday.[8] City Ex. AA at 10, attached to Murray Aff. dated August 21, 1995. Dr. Giridharan's notes confirm that a third spinal tap was performed on James on December 30, 1988. It is undisputed that James remained in the hospital until January 3, 1989. Mrs. Dietz and other members of her family, including Mr. and Mrs. Salmo, were with James in the hospital around the clock. L. Dietz at 29–30, City Ex. D, attached to Murray Aff. dated March 31, 1995. If James was ready for medical discharge on Saturday, December 31, 1988, the CWA hold prevented his release from that date until the hearing on Tuesday, January 3, 1989, the next day Family Court was in session.[9]

On January 3, 1989, the CWA child abuse petition was heard in Family Court and James was released to the custody of his grandparents. Plaintiff alleges that, at the hearing, the City requested that the court remand James to the custody of the Commissioner of Social Services. The court, however, "remanded James with the privilege of parole to the custody of [the Salmos and] . . . granted unlimited supervised visitation rights to Lenore and William Dietz." Parker Aff. dated July 29, 1992 ¶ 10. Parker was the CWA attorney responsible for the petition in Family Court. The docket sheet included the notation that James should have "no unsupervised contact with his parents." City Ex. M.

In his deposition, Parker explained that he, although a supervisor, was assigned to the case because "220 Church Street," HRA headquarters, had requested that a more experienced person be assigned. "[I]t was an unusual case and . . . the parents were being represented by a private attorney who was a friend of somebody at central office." Parker I at 23. Parker identified the person at central office as Gene Skarin, not a named defendant. *Id.* at 26.

It is undisputed that Mr. and Mrs. Dietz were never denied contact with their son, but that this contact was subjected to supervision by the Salmos from James' initial release on Saturday, December 24, 1988, to his hospital readmission on Wednesday, December 28, 1988, and, with the approval of Family Court, from his release from the hospital on Tuesday, January 3, 1989 until April 7, 1989.

Mr. and Mrs. Dietz' case came to Family Court again on February 16, 1989, where the discharge to the Salmos and restriction on unsupervised contact by the Dietzes was reconfirmed and the case adjourned to April 7, 1989. Parker Aff. ¶ 12, attached to City Mot. For Summ. J. dated July 31, 1992, Family Court docket sheet, City Ex. M.

---

7. This is presumably a reference to Dr. Margaret McHugh of Bellevue Hospital who was later retained by the Dietzes and provided an opinion that exonerated them.

8. Plaintiffs' attorney's allegation that "James was medically ready for discharge on ∴ . December 28, 1988," Kubitschek Ltr. dated October 31, 1995, is unsupported by any documentary evidence and is in direct conflict with Mrs. Dietz' detailed notes and Dr. Giridharan's report, and as a result, has not been credited by the court.

9. It should be noted that Family Court is not open on weekends or holidays. City Brf. dated August 2, 1995 at 11. The combination of weekends, holidays and hospitalizations prior to the Family Court hearing on January 3, 1988 may be somewhat easier to understand when depicted against a calendar, indicating dates, days of the week and events, attached as Appendix A.

#### (4)

The uncertainty about the identity of the abuser arose because the symptoms of WSIS may become manifest several hours after the baby is shaken. CWA was not sure, throughout the period both prior to and following the Family Court hearing on January 3, 1989, whether Mr. or Mrs. Dietz or Mrs. McGurn was the person who caused James' injury. Only in March 1989, when Dr. Giridharan wrote Parker and limited the time frame to exclude Mr. and Mrs. Dietz was there any basis on which a determination could be made as to the culprit. Thereafter, "the Court paroled James on April 7, 1989 to the care and custody of his parents and put the case over until June 8, 1989 pending the obtaining of a second opinion from an independent expert." Parker Aff. ¶ 14. The Family Court remand on April 7, 1989 included the direction that "[CWA] to supv. strictly." Family Court docket sheet, City Ex. M.

Mr. and Mrs. Dietz retained Dr. McHugh for this purpose. She was the Director, Child Protection Team, Bellevue Hospital Center. (Damas recorded in his notes that the Zone Director, Mr. Fenton, had contacted Dr. Margaret McCue (sic) on December 30, 1988. City Ex. I.) Based on her review of the records and placing especial emphasis on Det. Diggs' report that Mrs. McGurn stated that James took eight ounces of milk immediately prior to his manifestation of symptoms, Dr. McHugh opined, in an undated letter: "Such injuries [with "subarachnoid hemorrhage and bilateral retinal hemorrhag-

es"] would result in a listless, if not comatose, child who could not have fed well three hours later." [10] City Ex. O.

After Mr. and Mrs. Dietz submitted Dr. McHugh's undated letter, the CWA attorney, Parker, on June 8, 1989, "withdrew the abuse petition against Lenore and William Dietz without prejudice with three months supervision." Id. ¶ 16. Following the period of supervision (which lasted longer than three months, possibly as the result of Mrs. Dietz' absence on a trip to Hong Kong), the case was closed after a final visit by CWA staff on October 31, 1989. Mrs. Dietz' request for expungement of the child abuse report in the State Child Abuse and Maltreatment Register was granted on March 12, 1992. Pltf. Ex. H.

#### (5)

Although Mr. and Mrs. Dietz place full blame for the incident on the child's babysitter, Diane McGurn, Detective Diggs told Damas on December 28, 1988 that he was unable to determine who committed the act. The police formally concluded on January 21, 1989 that they were unable to establish who committed the assault on James.[11] Pltf. Ex. A, Det. Diggs' Report dated January 21, 1989. Subsequently, in a letter dated March 8, 1989, James' physician, Dr. Radha Giridharan, narrowed the window of time in which he might have been shaken and, thereby, eliminated Mr. and Mrs. Dietz from suspicion. In her letter, Dr. Giridharan stated: "In my clinical judgment and evaluation the

---

**10.** Dr. McHugh's opinion necessarily rests on the accuracy of Det. Diggs' report of Mrs. McGurn's statements to him, and, in fact, on the factual accuracy of her statement that James took most of a second bottle immediately before manifesting symptoms of WSIS. Damas' notes regarding what Mrs. McGurn said about James taking a second bottle conflict with the Detective's. It is also clear that Dr. McHugh did not have access to Damas' notes nor to any other account by Mrs. McGurn. Mrs. McGurn, of course, may have lied about the bottle to Det. Diggs. However, there are other possible explanations of the statement in the Detective's report aside from its literal accuracy—and they are more likely in light of the immediate sequence of events Mrs. McGurn related—James drinking the bottle, experiencing the seizure and then the prompt summons to and arrival of the ambulance. In view of the record in Damas' notes indicating that Mrs. McGurn said that James did not take the

second bottle, it is thus possible that Mrs. McGurn, herself, may have misspoken about when James took his bottles when speaking to Det. Diggs or he may have confused her statements about the first and second bottles when he drafted the report.

In addition, Elmore's notes state that Det. Diggs told him "[Mrs. McGurn] gave him another [bottle] an (sic) noticed that child's eyes did not look right and he was acting strange." Pltf. Ex. J. This formulation, if an accurate rendering of Det. Diggs' statement, is less definite, using a phrasing that could mean that the bottle was offered to James but not taken by him.

**11.** The police reports contain only favorable comments about Mrs. McGurn from neighbors, other parents whose children she cared for, and her pediatrician. See, Pltf. Ex. A.

bleeding occurred within a couple of hours (2) prior to his presenting to the Lutheran Medical Center." City Ex. N. In her deposition, Dr. Giridharan explained how she came to write the letter:

> And as time went on, because he was given to the grandparents and the decision had to be made, and by that time I was very comfortable with the Salmos and the Dietzes.... [Upon their request] if this is going to be interpreted as three, four and five, which I never said, I said okay, I am willing to make it as a couple, which will then narrow it down.

Giridharan at 34, City Ex. F.

On September 24, 1989, Mrs. McGurn was indicted for the crime. (Indictment attached as City Ex. T.) The District Attorney did not call Dr. Giridharan to the Grand Jury, but used Dr. Margaret McHugh as its WSIS medical expert. Justice Anne G. Feldman dismissed the indictment in March 1991, noting that: "... it was apparently Mrs. Dietz who brought Dr. McHugh's opinion to the attention of the prosecutor." Mem.Sup. Kings County, March 19, 1991, City Ex. U. Mrs. McGurn's indictment was dismissed because the prosecutor failed to present any evidence to the grand jury that implicated Mrs. Dietz in the abuse and permitted Mrs. Dietz to testify that "James was released to her care on both [releases from hospitalization]." [12] *Id.* The prosecutor also failed to instruct the grand jury properly with regard to the weight to be given the expert testimony presented. *Id.* Upon resubmission of the case against Mrs. McGurn to a grand jury, it refused to indict.

### Present Action

Mr. and Mrs. Dietz brought this suit on their own behalf and on behalf of their son, alleging constitutional and state law violation cognizable under 42 U.S.C. § 1983 on December 18, 1991 against the City and City individual defendants. They also have alleged pendent state claims against the City as well as a pendent state tort claim in negligence against Mrs. McGurn. In her answer, Mrs. McGurn has asserted counterclaims against Mr. and Mrs. Dietz for malicious prosecution and defamation, founded specifically on Mrs. Dietz' testimony to the Grand Jury concerning the conditions under which James was released from the hospital and has asserted that any harm that befell James Dietz occurred while he was in their exclusive control.

Plaintiffs allege eleven causes of action. The first, second, third, fifth, sixth, seventh and eighth (against the City and individual City defendants) arise under 42 U.S.C. § 1983, the fourth (also against the City and individual City defendants) under the United States Adoption Assistance and Child Welfare Act, 42 U.S.C. § 671(a), and the ninth and tenth claims (against the City and the individual City defendants) are pendent state law claims sounding in negligence and libel. The plaintiff's eleventh cause of action is a state law claim sounding in negligence against the babysitter, Mrs. McGurn, as a pendent party. Mrs. McGurn's counterclaims are also asserted under state law.

The § 1983 causes of action asserted against the City and the City individual defendants allege:

First: under "a policy of removing and detaining children from their parents without probable cause and without due process of law," Compl. ¶ 48, they wrongfully took "custody" of James without providing Mr. and Mrs. Dietz timely notice and an opportunity to be heard.

---

**12.** Mrs. Dietz responded affirmatively to questions at the grand jury that asked if James was "cleared to go home" on his release from Brookdale Hospital on December 24, 1988. She also responded affirmatively to a question as to whether he had "been in your care since January 3rd?" Mem.Sup. Kings County, Feldman, J., Dismissing the indictment of Diane McGurn, March 19, 1991, City Ex. U.

In plaintiffs' attorney's affidavit dated November 19, 1993, ¶ 24, Mrs. Dietz' grand jury testimony is explained as follows: "... Lenore Dietz' statements were truthfully made. On December 24, 1988, as Lenore Dietz stated, James had been cleared by the hospital to go home. James Dietz was cared for by Lenore Dietz since January 3, 1989, as she and William Dietz lived with her parents during that time. Additionally, plaintiffs were not parties to the proceeding in which the determination was made and had no opportunity to explain Lenore Dietz' answers, present their own evidence or appeal."

Second: by "provid[ing] grossly inadequate and unprofessional training and supervision to their agents and employees regarding the investigation of child abuse complaints and probable cause determinations," Compl. ¶ 61, they conducted a constitutionally inadequate investigation which led it to target Mrs. Dietz as a suspect.

Third: their actions against Mr. and Mrs. Dietz were pursuant to a malicious and retaliatory policy, in violation of Mr. and Mrs. Dietz' First Amendment rights, because the Dietzes had complained to CWA supervisors and management and some politicians about the way the CWA was conducting its investigation.

Fourth: they violated the United States Adoption Assistance and Child Welfare Act, 42 U.S.C. § 671(a).[13]

Fifth: they violated New York statutes and regulations, cognizable under § 1983, "requir[ing] Department of Social Services employees to provide services to preserve families prior to removing children and to reunify families subsequent to the children's removal." Compl. ¶ 78.

Sixth: they unlawfully interfered with parental rights.

Seventh: they unlawfully imprisoned the infant.

Eighth: they abused governmental power in labeling Mr. and Mrs. Dietz child abusers, thereby violating Mr. and Mrs. Dietz' rights to privacy, depriving them of liberty and reputation.

Ninth: negligence.

Tenth: libel.

Defendant McGurn has alleged any injury to James Dietz occurred while he was in the custody and control of Mr. and Mrs. Dietz and has asserted defamation and malicious prosecution claims against Lenore Dietz.

The City first moved for summary judgment on August 5, 1992, on grounds that there were no issues of material fact regarding the absence of a constitutional violation in the City's actions with regard to the Dietz family and, even if that were denied, that the individual defendants were entitled to dismissal of the claims against them on the basis of their qualified immunity. On September 16, 1992, Judge Dearie ordered the withdrawal of the City's motion, pending the completion of discovery agreed to by the parties.

Thereafter, plaintiffs conducted voluminous discovery of the City individual defendants and other City officials.[14] Dr. Giridharan was deposed by all parties. The plaintiffs filed papers in opposition to the motion for summary judgment in November 1993. The case was transferred from Judge Dearie to this Court on January 21, 1994.

This Court, at oral argument on March 11, 1994, denied the City's motion for summary judgment, with leave to renew following a deposition of the plaintiffs (subsequently clarified to refer to Mrs. Dietz) to obtain her account of her alleged consent to James' placement with the Salmos and to ascertain the nature of the claimed deprivation. Once this deposition was completed, the Court gave the City leave to renew the motion that any deprivation was de minimis, as well as to renew the motion for summary judgment. The Court also stayed discovery on *Monell* claims and with respect to defendant McGurn. In August 1995, the City submitted a renewed motion for summary judgment. Oral argument on this renewed motion was heard on October 24, 1995.

## Discussion

The primary legal issue presented by this case is what process is due to parents suspected of abusing their child where, in re-

---

13. The fourth cause of action has been withdrawn by the plaintiffs, Pltf. Brf. dated November 19, 1993 at 25, in recognition of the Supreme Court holding that there is no such private right of action under the Adoption Assistance and Child Welfare Act, 42 U.S.C. § 671(a). *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992).

14. Damas, Elmore and Parker were deposed twice, Vitelli and Lewis once. Vitelli is the caseworker who prepared the child abuse petition for the January 3, 1989 Family Court hearing and Lewis became Damas' supervisor upon his promotion in "February or March '89." Lewis at 8. Damas reported that his promotion occurred in the late December 1988 or early January 1989. Damas at 5, City Ex. H.

sponse to a deliberately inflicted and severe injury to a child, the child protection agency has imposed restrictions upon parental contact with and control of their child, without, however, removing the child from contact with the parents. The case also raises claims regarding alleged constitutional violations (and alleged violations of state law argued by plaintiffs to be cognizable under 42 U.S.C. § 1983) related to child abuse investigations and prosecution, as well as a number of state law claims. These issues are presented in the context of a summary judgment motion by the City and the City individual defendants, in which justifiable inferences must be drawn in favor of the plaintiffs, although the plaintiffs must produce evidence that would support a jury verdict.

The standard for deciding motions for summary judgment is specified in the Federal Rules of Civil Procedure:

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). "On a summary judgment motion, the court is not to weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact," *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995), but, as the Supreme Court noted in *Celotex Corp. v. Catrett:* "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Although all justifiable inferences of the non-movant are to be credited, the non-movant must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor.... The movant has the burden of showing there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict."

*Anderson* at 256, 106 S.Ct. at 2514. Not all disputed facts are a basis for denying summary judgment. "The non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." *Samuels v. Mockry,* 77 F.3d 34, 36 (2d Cir.1996).

1. **The Individual City Defendants Had an Objectively Reasonable Belief that an Emergency Existed When CWA Placed "Hold" on James Dietz on December 22, 1988.**

(1)

■ The Supreme Court has stated: "Due process ... is a flexible concept that varies with the particular situation." *Zinermon v. Burch,* 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990). The Court further defined the factors that must be weighed to determine "what procedural protections the Constitution requires in a particular case:"

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 127, 110 S.Ct. at 984 (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)).

■ Plaintiffs have alleged that the procedure followed by the City and the individual City defendants violated state law. However, a violation of state law does not in itself establish a constitutional violation for which remedy may be sought under 42 U.S.C. § 1983. In *Robison v. Via,* 821 F.2d 913, 922–23 (2d Cir.1987), referring to a similar claim with regard to the seizure of children suspected of having been abused without "being taken directly to the juvenile court as required under [Vermont law]," the Second Circuit held that: "Federal constitutional standards rather than state statutes define the requirements of procedural due process."

"[E]ven if the phrase 'immediate danger' in the Vermont statute sets a standard different from the 'emergency' standard under the due process clause as we have described it, a violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim." *Id.* at 922.

### (2)

■ It is widely recognized that child abuse proceedings, especially those following immediately upon discovery of a child abuse emergency, involve special interests that are different from those implicated in criminal proceedings. Critical to these special interests is the need to balance the interests of the parents against that of preventing further injury to the child. The law of this Circuit, as well as of other federal courts, is clear that, constitutionally, no prior hearing is required to remove a child from parental custody in an emergency situation. "[I]t was, and remains, equally well established that officials may temporarily deprive a parent of custody in 'emergency' circumstances 'without parental consent or a prior court order.'" *Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987) (quoting *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir.1977)) (other citations omitted). *See also Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983): "When a child's safety is threatened, that is justification enough for action first and hearing afterward."

Plaintiffs, in their brief, place great emphasis on *Hurlman v. Rice*, 927 F.2d 74 (2d Cir.1991). *See* Pltf.Brf. dated November 19, 1993, at 46–49. Plaintiffs argue that the facts before this court are "virtually identical" to those in *Hurlman.* In *Hurlman,* the Second Circuit found that jury questions existed as to whether it was objectively reasonable for each of the state troopers involved in the seizure of the child to believe the child there was in danger where there was only "the mere 'possibility' of danger." However, the seizure of the child in *Hurlman* by the state police (with no involvement by child protection services) was essentially the result of intervention by the police on behalf of a colleague in a custody dispute.

The alleged "possibility of danger" to the four year old girl in *Hurlman* was from the child's grandfather who had pled guilty eighteen months earlier to a misdemeanor charge that he had given a Reader's Digest article on how to stop child prostitution to his seven year old grandson. The child's father was a state trooper who had persuaded his colleagues to seize his daughter about midnight from her mother, who lived with the mother's parents. Four days after her seizure, the child was returned to her mother by order of the family court. 927 F.2d at 78.

The *Hurlman* court stated: "Emergency circumstances mean circumstances in which the child is immediately threatened with harm . . ." It gave the following examples of such threats: "where there exists an immediate threat to the safety of the child, or where the child is left bereft of care and supervision, or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence." *Id.* at 80 (quotations omitted). The *Hurlman* court distinguished its facts from those in *Robison v. Via* in the following manner: "[T]he reported harm to the Robison children was physical and was ongoing, and there was no room for any inference that there was not an emergency situation." *Id.* at 80.

Thus, knowledge of an emergency, or objectively reasonable belief that there is "serious ongoing abuse and the officials have reason to fear imminent recurrence," *id.*, would create an important basis for distinguishing the case before this court from *Hurlman.* *Hurlman* represented essentially private action undertaken for private purposes by public actors. Where "there [is] no room for any inference that there was *not* an emergency situation," *id.*, the court may direct summary judgment for the state actors.

### (3)

There is no material fact at issue that the Report of Suspected Child Abuse or Maltreatment (the 2221) filed by a hospital staff member at Dr. Giridharan's direction, notifying the State child abuse central registry that James had been admitted to hospital for injuries resulting from Whiplash Shaken Infant Syndrome, provided notice of an emer-

gency to CWA. There is also no dispute that CWA received this report on December 22, 1988 and assigned responsibility for its investigation to CWA caseworker Harold Damas. CWA placed a hold on James' discharge from the hospital on the basis of that report and Damas' conversation with Dr. Grillo on December 22, 1988.

The report indisputably stated that James' parents were suspects in James' abuse. (It is also indisputable that the report contained some statements later determined to be erroneous.) The report had been made by a hospital staff member, at the request of the treating physician, Dr. Giridharan, who was legally obligated to report suspected abuse. Such a report of an emergency, filed by an identified, disinterested person with cause to know of abuse and a legal obligation to report it, confirmed by the treating resident physician, constitutes objectively reasonable evidence of an emergency to child protective personnel. Further, Damas' conversation with Dr. Grillo confirmed the report in essential elements.[15]

The analogy of Mr. and Mrs. Dietz' situation to the facts in *Hurlman* that plaintiffs would have the court draw is simply unconvincing. There, state troopers sought to establish that the statements of a fellow officer that his daughter was at risk of sexual abuse from her grandfather created an objectively reasonable belief that an emergency existed. In *Hurlman,* there was an obvious private interest on the part of the state actor reporting the abuse, there was no actual objective injury, and there was no inquiry into the circumstances. Here, the report of abuse was by a disinterested third party, there was objective evidence of physical abuse, and the inquiry at the hospital confirmed the basic outlines of the report.

Until Damas met with Mr. and Mrs. Dietz on the evening of Friday, December 23, 1988, the errors in the 2221 were not known to CWA. (Damas had attempted to meet with Mr. and Mrs. Dietz on December 22, 1988, the day CWA received the 2221 report, by going to their home. He left a copy of the W–555C form at their home, notifying them that the report had been filed and giving them his phone number. City Ex.K.) Indeed, before CWA knew that some of the information in the 2221 was erroneous, that is, until Damas met with the Dietzes and Salmos on the evening of December 23, 1988, CWA would be seen to have been derelict in its duty to protect James had it *not* prevented his discharge to his parents. When Damas became aware of the overstatement of the case against Mr. and Mrs. Dietz in the 2221 report, he consented to the proposal made by Mr. Salmo to discharge James to his grandparents, the Salmos. The discharge permitted Mr. and Mrs. Dietz to have contact with James under the supervision of Mrs. Dietz' parents. This decision greatly limited the infringement on Mr. and Mrs. Dietz' custody of James, as it never prevented their contact with him, either in the hospital or in a family setting.

However, although Damas learned that the case against Mr. and Mrs. Dietz in the 2221 report had been overstated, the new information he now had did not exonerate the Dietzes. From his meeting with Mr. and Mrs. Dietz, Damas learned the time parameters of Mr. and Mrs. Dietz' and Mrs. McGurn's contact with James. These parameters made determining the time of the shaking essential. Moreover, contrary to plaintiffs' assertion, nothing in Damas' notes or testimony indicates that Mr. Dietz had been cleared of suspicion in this time period. Damas' case notes suggest that Mrs. Dietz' conduct while Mr. Dietz was speaking, at the meeting on December 23, 1988, when she "got up for a moment and went to the kitchen and stayed there for a few seconds, running her fingers through her hair and returned to living room," might well have raised some suspicions of Mr. Dietz in his mind. CWA's understanding of the time frame in which the abuse could have occurred throughout the period until it was narrowed by Dr. Giridharan in March 1989 was still long enough to include Mr. Dietz as

**15.** In *Tenenbaum v. Williams,* 862 F.Supp. 962, 971–72 (E.D.N.Y.1994), a teacher's report of what she believed to be a description, from a verbally impaired five year old girl, of sexual abuse by the girl's father was held to create the basis for an objectively reasonable belief that an emergency existed that justified the City's assumption of custody.

a suspect. Thus there is no need to determine whether CWA should have attempted to remove Mrs. Dietz from their home in order to minimize interference with Mr. Dietz' custody of his son.[16] Thus, the initial assertion of custody by CWA was fully warranted by objectively reasonable notice of a child abuse emergency.

The Second Circuit has held, in factual circumstances remarkably similar to those before this court, that a child protective agency's assumption of *total* custody of a child was objectively reasonable and thus did not violate the parents' constitutional rights. *van Emrik v. Chemung County Dep't of Social Serv.*, 911 F.2d 863 (2d Cir.1990). There, as here, an infant was admitted to a hospital with serious physical injury suggestive of child abuse, the time frame of abuse implicated both a babysitter and the parents, none of whom had any history or indicative psycho-social factors suggestive of abusive behavior, and, ultimately, no conclusive determination was made as to who, if anyone, abused the child. In *van Emrik*, the court cautioned against "fault[ing] the manner in which the temporary removal was effected." 911 F.2d at 866. "The issue is whether it was objectively reasonable for the defendants to make the decision they made, and no rational jury could find that it was not." *Id.*

In *van Emrik*, the Second Circuit affirmed the district court's dismissal of a suit against the county and, with one exception not applicable here, held that the actions taken by the social workers and agency "show no impairment of a constitutional right." *Id.* It thus affirmed the entitlement of the individual defendants to qualified immunity. As noted at the outset, in *van Emrik*, the Second Circuit explicitly acknowledged the "difficult alternatives" faced by child protection caseworkers "in the context of suspected child abuse." *Id.* at 866.

A recent case in this district has also considered the due process issues concerned in seizure of a child under the perception that a child abuse emergency exists. In *Tenenbaum v. Williams*, 862 F.Supp. 962, 971–72 (E.D.N.Y.1994); mot. for rearg. denied, 907 F.Supp. 606 (E.D.N.Y.1995), Judge Hurley held that, as a matter of law, there was no due process violation in the emergency removal of a child from the custody of its parents on the basis of a report by the child's teacher that the child had indicated that she had been sexually abused by her father. He concluded, however, that a probable cause requirement would be "unlikely to frustrate the state's attempts to investigate child abuse." *Id.* at 976. In the case he decided, however, probable cause with regard to seizure of the child and probable cause as to the identity of the alleged abuser were co-extensive. It is not clear to this court that a probable cause requirement, that is, a requirement of probable cause *both* with regard to the parents' (or other custodial persons') involvement *and* to the existence of injuries constituting a child abuse emergency, would not, contrary to Judge Hurley's observation, at times, "frustrate the state's attempts to investigate child abuse." In the *van Emrik* case, as in the case before the court, where the fact of the abuse was known, but it was not possible to eliminate a parent or parents from suspicion, the evidence specifically implicating an individual parent may not have risen to the level of probable cause. When the original report of abuse comes from a hospital setting it is not unlikely that the hospital or child protective agency will initially lack information sufficient to establish probable cause against any one individual. The need to protect an abused child may require restriction of parental custody temporarily, while an investigation is conducted and, even thereafter, if its findings are unable to eliminate parents (or other custodial persons) from suspicion.

Despite plaintiffs' attempt to equate seizure of a child in child abuse proceedings to criminal arrest, with the concomitant obligation to establish probable cause within

---

**16.** A similar claim was advanced in *Tenenbaum*, and also rejected there, on the grounds that the removal of the child was from the *home* in which it was alleged that she had been sexually abused by her father. The impact on her mother was

the parameters required for arrests [17] with regard to the restrictions placed on the parents, this position simply does not find support in the case law. Pltf.Brf. dated November 19, 1993 at 51. Family Court proceedings are "civil in nature and a finding of abuse or neglect need only be supported by a preponderance of the evidence." *In the Matter of Nicole V.,* 71 N.Y.2d 112, 117, 524 N.Y.S.2d 19, 518 N.E.2d 914 (1987). Although in *Nicole V.,* the New York State Court of Appeals was referring specifically to sexual abuse of children in its discussion of policy, it would appear even more applicable to WSIS which generally involves babies incapable of testifying: "Such abuse is difficult to detect because the acts are predominantly nonviolent and usually occur in secret rendering the child the only witness. Moreover, once abuse is uncovered it is difficult to fix blame, not only because of the lack of evidence but also because of the reluctance or inability of victims to testify." *Id.*

New York State has, by statute, established a res ipsa loquitur approach to certain types of child abuse, denominating certain types of injuries as prima facie evidence of abuse or neglect. Under N.Y.Jud.L. (Family Court Act) § 1046(a)(ii):

> [P]roof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the care of such child shall be prima facie evidence of child abuse or neglect, as the case may be, of the parent or other person legally responsible.

Whiplash shaken baby syndrome (WSIS) has been held to be such an injury, constituting prima facie evidence of abuse. In *In re Antoine J.,* 185 A.D.2d 925, 587 N.Y.S.2d 13 (2d Dep't 1992), the Second Department held that proof of WSIS was sufficient to establish that an infant had been abused. "[I]n view of the failure of the mother to offer any reasonable explanation for the physical injuries of [the infant and his brother] we are satisfied that findings of abuse and neglect were established upon a preponderance of credible evidence." *Id.*

In an earlier WSIS case, *In re Lou R.,* 131 Misc.2d 138, 143, 499 N.Y.S.2d 846 (Family Court, Onondaga County 1986), the court held: "Common experience adds that a six-month-old infant could not have shaken himself to such a degree. No credible evidence was offered by the parents to support any other satisfactory explanation of the child's condition." Interestingly, the expert testimony in *Lou R.* provided a far wider time frame for the damage to the child to become manifest after the shaking occurred than was eventually asserted in this case. The child's symptoms in *Lou R.* were apparently similar to those suffered by James Dietz, "retinal hemorrhage, as well as presence of unexplained blood in the cranial cavity, without any evidence of any trauma or blow to the child ... and unexplained blood in the spinal fluid," although the consequences were different, breathing difficulties and seizures in *Lou R.,* blindness for James Dietz. "Assuming an infant to have been shaken severely enough to cause the signs initially noted in this case, the unrebutted testimony was that these signs might present themselves at any time from within several hours of the incident to four-five days later, but would probably be manifest within two or three days of such shaking." *Id.* at 141, 499 N.Y.S.2d 846.

As in *van Emrik,* plaintiffs have provided no evidence that disproves the objectively reasonable nature of the limitations defendants placed on Mr. and Mrs. Dietz' custody of their son. It was objectively reasonable, both, for the City defendants, on December 22, 1988, to place a hold on James' discharge from the hospital, and, on December 23,

---

not a violation of her mother's constitutional rights. 862 F.Supp. at 978.

17. *See County of Riverside v. McLaughlin,* 500 U.S. 44, 55, 111 S.Ct. 1661, 1669, 114 L.Ed.2d 49 (1991), where the Supreme Court, although stating, "[i]n our view, the Fourth Amendment permits a reasonable postponement of a probable cause determination while the police cope with the everyday problems of processing systems through an overly burdened criminal justice system," found that forty-eight hours was the boundary of constitutionally permissible delay in providing a judicial determination of probable cause in arrests.

1988, to condition his release on the Salmos' custody and supervision of Mr. and Mrs. Dietz' contact. Moreover, accepting, as the court must for purposes of evaluating a motion for summary judgment, the plaintiffs' assertion that they consented to James' discharge to the Salmos· only under duress, because their alternatives were limited custody or none at all, does not alter this conclusion because total denial of custody was warranted under the circumstances known to CWA on December 23, 1988.

Thus, summary judgment on plaintiffs' claim of a violation of the Fourth Amendment in CWA's "seizure" of James, part of their first cause of action, is warranted, first to City individual defendants in their individual capacities on the basis of qualified immunity, because each had an objective, reasonable belief that an emergency situation existed. Second, summary judgment relating to the seizure portion of the plaintiffs' first cause of action is also warranted to all City defendants in all capacities because it is well-established that a seizure made without a hearing under the reasonable belief of a child abuse emergency does not violate plaintiffs' constitutional rights.

## 2. The Delay in Providing an Adversarial Hearing Did Not Deny Mr. and Mrs. Dietz Due Process.

### (1)

■ Having found that there are no material facts in dispute regarding nature of CWA's actions, under an emergency situation, in its initial assertion of control of James' custody on December 22 and 23, 1988, it is still possible that CWA's delay in providing a hearing until January 3, 1989 was a denial of Constitutionally guaranteed procedural due process to Mr. and Mrs. Dietz and to James. The delay in providing a hearing from Thursday, December 22, 1988, the date CWA received notice of abuse and thus the earliest date that CWA could have brought a proceeding, to Tuesday, January 3, 1989, was twelve calendar days.[18] Family Court was in

session on only six of these twelve days because of the two holidays, Christmas and New Years Day. This period certainly exceeded the forty-eight hours that would be permitted in criminal arrest processing.

As noted, *supra* p. 444, the Second Circuit held, in *Robison v. Via*, that there was no denial of due process guarantees when, in emergency circumstances, the state assumed by *temporary* custody without a court order. 821 F.2d 913, 921 (2d Cir.1987) (citing *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir.1977)). The *Duchesne* court also held: "However, in those 'extraordinary situations' where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed." *Id.* The court found that due process had been violated in *Duchesne* where the City postponed a hearing for *thirty-six months*.

In *Cecere v. City of New York*, 967 F.2d 826 (2d Cir.1992), the Court held that an assertion of custody that lasted at most four days, although it effectuated complete denial of contact, as well as custody, to the mother, "was permissible because an emergency situation existed, but that the defendants were required to seek judicial ratification before asserting *permanent* custody." *Id.* at 830. There, the court further explained its earlier ruling in *Duchesne:* "The facts of the instant case thus fall within Duchesne's explicit recognition that temporary assertions of custodial authority in the face of a reasonably perceived emergency do not violate due process." *Id.*

In *van Emrik*, an eight-day delay in providing an adversarial hearing,[19] during six days of which court was in session, was held not to deny due process. The child was initially placed in foster care but was then transferred back to the hospital, with a hold on discharge without the county's consent. After an eight day investigation, "which ended without any finding of responsibility for

---

**18.** *See* Appendix A for a calendar of the events in this case set against the days of the week and holidays in the period prior to the Family Court hearing.

**19.** In *van Emrik*, ex parte approval was obtained prior to the assumption of the child's custody by the County.

the injury," the child was released to her parents (apparently without a further hearing).[20]

Section 1011 of the New York Family Court Act states that the obligation of that court in child protective proceedings is "to help protect children from injury or mistreatment and to held safeguard their physical, mental, and emotional well-being." For that reason, New York courts, for example, have refused to inject an exclusionary rule into Family Court child abuse proceedings. *See In re Anne "BB"*, 202 A.D.2d 806, 807–08, 609 N.Y.S.2d 111 (3d Dep't 1994): "Our courts should never lose sight of the State's interest as parens patriae in protecting the well-being of children, and the overwhelming interest in the safety of children far outweighs any deterrent value of an exclusionary rule . . . ."

■ Protection of children, the objective of state law, may, under compelling circumstances, override constitutionally guaranteed parental interests. Where a child abuse emergency exists, federal courts have repeatedly found that the child's interest is sufficient to justify not only an initial seizure of the abused child but also some delay before providing a hearing to permit child protective workers to investigate the circumstances. Even though the interference with the child's custody was total under emergency situations in *Cecere* and *van Emrik*, delays in those cases in providing an adversarial hearing to the parent(s) far in excess of the maximum of forty-eight hours permissible in criminal arrests were held compatible with constitutional due process by the Second Circuit.

Other federal courts have approved even more extensive delays. Justified delay in providing an adversarial hearing under emergency child abuse situations, the Seventh Circuit held, in *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983), did not deny constitutional due process:

> [T]here is no denial of due process in refusing to grant a full adversary hearing before taking away property or liberty, so long as such a hearing is provided later (as it was here) and there is justification for the delay. When a child's safety is threatened, that is justification enough for action first and hearing afterward.

Here, as in *Lossman*, the plaintiffs dispute that a true emergency existed. There, as here, the hearing took place after a twelve calendar day delay and confirmed the prehearing action. In *Newton v. Burgin*, 363 F.Supp. 782, 786 (W.D.N.C.1973) (three judge panel), *aff'd* 414 U.S. 1139, 94 S.Ct. 889, 39 L.Ed.2d 96 (1974), the North Carolina law that permitted a delay of up to five days, as well as a case that was actually delayed seven days, were held not to deny due process.

The *Newton* court found that the law concerning post deprivation proceedings related to property and money disputes was not entirely applicable "in factual situations dealing with immediate human needs which require a more flexible hand in dealing with problems such as the care of children." 363 F.Supp. at 787. The court found that the North Carolina child abuse and neglect statute challenged in *Newton* "certainly [implicated] an important governmental interest and public interest in guarding the welfare of neglected children. And surely the care and needs of children require 'very prompt action,' " comparable to that the court found had been held, under some circumstances, to justify post-deprivation proceedings with respect to seizure of property or money. *Id.*, quoting *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

These decisions have recognized a need to balance the interests of "the parent in the

---

**20.** The Van Emriks pursued their litigation against the county and its employees in state court after dismissal, without prejudice, by federal district court following remand by the Second Circuit. The result in state court appears to be the same as in federal court. *See Van Emrik v. Chemung County Department of Social Services*, 632 N.Y.S.2d 712 (3d Dept.1995), affirming the lower court's grant of summary judgment on the basis of qualified immunity on all claims except that excepted by the Second Circuit after the Appellate Division's remand under *Van Emrik v. Chemung County Department of Social Services*, 191 A.D.2d 143, 600 N.Y.S.2d 157 (3d Dept. 1993) (reinstating case, holding that dismissal of federal § 1983 claims did not present collateral estoppel bar to suit on state claims).

custody of his or her child and the interest of the State in protecting and caring for children who are being neglected." *Newton*, 363 F.Supp. at 786. Although the Supreme Court, in *DeShaney v. Winnebago County*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), has held that an abused child does not have a constitutional right to be protected from such abuse,[21] nonetheless the rights of the abused child, represented here by the City in its actions following the reported abuse, may appropriately be balanced against even the constitutionally protected rights of his parents.[22] The critical consideration is that "the potential consequences of erroneously leaving or returning a child to an abusive situation are enormous." *J.B. v. Washington County*, 905 F.Supp. 979 (D.Utah 1995).

### (2)

The interest represented by the State in child abuse proceedings always has the face of a defenseless child, while only occasionally is such a face found in criminal proceedings. Erroneous failure to remove a child may place the child in the full power of an abusive person. In *Newton*, the court articulated this concern:

> There is no doubt that most parents do not want to be without the custody and companionship of their child for five days, but this is a relatively small price to pay compared to the possible neglect or mistreatment that a helpless child might have to endure were it not for the immediate ac-

tion that can be taken under [the North Carolina statute].

363 F.Supp. at 787.

The *Newton* panel found that the need for preparation justified the delay in providing an adversarial hearing to a parent deprived of custody: "Five days would appear to be the *minimum* time that either party could prepare for a hearing to determine the fitness of a parent." 363 F.Supp. at 788. (Emphasis added.) For that reason, the panel found benefits accrued to all parties from the delay:

> Certainly the interests of the child will be better represented if there is time to investigate the living conditions of the child before the hearing, and in most cases the parent needs time to prepare his or her case to rebut the State's allegations and to obtain character witnesses. In many instances the time to prepare his or her case will benefit the parent because the hearing court, rather than having to rely on the facts surrounding a single incident alleged in the petition, will have more information about the parent.

*Id.* at 788.

Particularly when a child abuse investigation begins with the admission of an injured child to a hospital and the child protective agency has no prior knowledge of the parents or the child, such an agency needs time to conduct an investigation. The agency's ability to protect the child from harm could easily be frustrated by requiring an immediate adversarial hearing. Similarly, although the pain to parents from deprivation of their child is

---

**21.** There may be such a right under New York State law once a report of abuse has been made to the State Central Register. *See, Boland v. State of New York*, 218 A.D.2d 235, 638 N.Y.S.2d 500 (3d Dept.1996), in which the Appellate Division, Third Department, held, on February 29, 1996, that "the State's enactment of the detailed and comprehensive statutory scheme [under which the State administers the State Central Register and monitors the provision of child protective services] ... establishes, as a matter of law, the existence of a special relationship between the State and claimant's children...."

**22.** This is in accord with findings that other public interests weigh in the balance against otherwise constitutionally protected rights. The Supreme Court has held, for instance, that, al-

though ordinarily prohibited under the Fourth Amendment, seizure of blood and urine for drug and alcohol testing without individualized suspicion or a warrant may be justified on the basis of the public interests involved. *See Skinner v. Railway Labor Executives' Assoc.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (minimal intrusion in employee's privacy warranted by the public interest in safe transportation) and *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 668, 109 S.Ct. 1384, 1392, 103 L.Ed.2d 685 (1989) ("We think the government's need to conduct the suspicionless searches required by the Customs program outweighs the privacy interests of employees engaged directly in drug interdiction, and of those who otherwise are required to carry firearms.").

not to be gainsaid, a delay does permit parents, as it did here, to obtain representation and prepare a defense.

Here, where a child protective agency has ample cause to believe, first, that a child has been abused, based on a report from a disinterested hospital staff member and second, that there is reason to suspect the child's parents in the abuse, to force it to conduct an immediate post-deprivation adversarial hearing under all circumstances would be foolish. It may divest the agency of its ability to protect children. This concern has particular strength when the restriction on parental custody is limited, as in a "hold" retaining the child in hospital or a discharge to other family members supportive of the parents. From a policy standpoint, making restriction of parental custody dependent on an immediate adversarial hearing may, on the one hand, cause child protective agencies to delay intervention and thus fail to prevent further harm, despite their knowledge that harm has occurred, and, on the other, to fail to prevail at a hearing where there is real danger to the child because they have been unable to conduct an investigation.

As noted, in *Cecere* and *van Emrik*, the Second Circuit found no denial of constitutional due process in circumstances where parental custody had been *totally* abrogated and there were, respectively, four and twelve day delays in providing an adversarial hearing. Here, the infringement of parental custody was far more limited than in either of those cases. The occurrence of the Christmas holidays was also disruptive of investigation efforts here, as it was not in *Cecere*, *Lossman* and *van Emrik*, and the court days available for prosecution of the case were limited.

### (3)

Thus, applying the standard enunciated in *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990), for determining if a state action constitutes a denial of constitutionally guaranteed due process, we must consider, first, "the private interest ... affected by the official action." The second consideration is "the risk of an erroneous deprivation of such interest ... and the probable value, if any, of additional

or substitute procedural safeguards; and the final consideration, the Government's interest ...." 494 U.S. at 127, 110 S.Ct. at 984.

The private interest involved in the child abuse proceeding against Mr. and Mrs. Dietz was Mr. and Mrs. Dietz' and James' interest in maintenance of parental relations and custody. These interests were infringed relatively modestly by James' discharge to the custody of his grandparents, the Salmos, because Mr. and Mrs. Dietz' contact with James was never interrupted and because the relation between the families was so close.

The second *Zinermon* factor, the risk of an erroneous deprivation of these interests was minimized by, first, the minimal infringement of Mr. and Mrs. Dietz' custody by permitting them unlimited contact with James, subject only to the supervision of Mrs. Dietz' parents, and, second, by CWA taking sufficient time to conduct an adequate investigation before filing a petition or removing the restrictions on the custody of James. The third factor, the Government's interest, lay in the protection of James from further abuse. James' interest in no further abuse was reasonably believed by CWA to be protected by the limitation on his parents' custody and by the conduct of an adequate investigation. No reasonable jury could find a constitutional denial of due process in the delay in providing an adversarial hearing in this case prior to January 3, 1989. The delay was roughly equal to those in *van Emrik* and the Seventh Circuit case, *Lossman*, while the infringement on Mr. and Mrs. Dietz' custody was far less substantial than in both those cases.

Further, the infringement on Mr. and Mrs. Dietz' custody was confirmed by the Family Court at the adversarial hearing on January 3, 1989, at which Mr. and Mrs. Dietz were represented by counsel. Both the CWA perception of an emergency child abuse situation and the limitations on Mr. and Mrs. Dietz' custody placed by CWA were confirmed by the hearing. The court released James to the custody of his grandparents and provided that James should have "no unsupervised

contact with his parents." [23] Family Court docket sheet, City Ex.M.

The Seventh Circuit, in *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983), found that such judicial confirmation, in itself, established the prudence of the state acts infringing parental custody and "extinguishes a claim that the failure to hold a predeprivation hearing was a denial of due process." There, the court also held that the plaintiff "cannot get damages for loss of custody that a more reliable hearing showed he was not entitled to retain, just because there is some chance that in a less reliable, because shorter and more hastily convened, hearing he would have been entitled to retain custody of them." *Id.*

### (4)

Plaintiffs argue that the New York Family Court Act imposes a requirement that "when the Commissioner of Social Services wishes to keep a child whom caseworkers have removed on an emergency basis, the Commissioner must commence a child protective proceeding ... on the next court day." Pltf.Brf. dated November 19, 1993 at 44. In fact, the statute does not say what plaintiffs claim. It provides, in § 1026(c): "If the child protective agency for any reason does not return the child under this section, or if the child protective agency concludes it appropriate, it shall *forthwith* cause a petition to be filed under this act." Plaintiffs have cited no New York court cases for their interpretation of the statute, and the City has provided one that denied a claim based on greater delay. *See e.g. Lindeman v. City of New York,* N.Y.L.J., August 24, 1994, at 27, col. 3 (N.Y. County Sup.1994), where damages were denied to parents whose child was placed in foster care for eight days, a neglect petition was initiated after five days, and a hearing was held that returned the child to her parents unconditionally after eight days. There, unlike here, the neglect petition was ultimately dismissed, some three months after it was filed.

The Practice Commentary on the Family Court Act § 1026(c) by Douglas J. Besharov in McKinney's (1983) notes the specific refusal of the Legislature to establish the precise limit plaintiffs describe:

> Because other sections of the Family Court Act are careful to provide precise time limits, e.g., "twenty-four hours," "next court day," and "seventy-two hours," the fact that the Legislature chose not to do so here is clear indication that a more flexible time limit was envisioned.

The Commentator goes on to note that: "[e]xcept on weekends or in unusual situation, 'forthwith' should probably mean within twenty-four hours, because the propriety of the initial decision should be reviewed by a court as soon as possible." However, *Lindeman* suggests that state courts do not apply an extremely stringent test before finding "unusual circumstances."

It is undisputed that the City defendants did not file a petition on the next court day of their initial placement of a hold on James' initial discharge from the hospital or even on December 27, 1988, the next court day after James was released in his grandparents' custody. This would have been the earliest reasonable time that a hearing could have been held, as Damas was unable to meet with the Dietzes until Friday evening, December 23, 1988. The hold at the hospital only became effective when James was cleared for discharge on December 24, 1988. However, by December 27, 1988, James was to be readmitted to the hospital the next day, December 28, 1988, and was not again cleared for discharge from the hospital until December 31, 1988. During a period in which CWA had many unanswered questions and both the detective and the treating specialist physician took two days to return Damas' phone calls, James' prognosis was of great concern.

Although, in hindsight, it is easy to find the Brookdale Hospital source officious and unreliable, in December 1988 and early Janu-

---

**23.** Plaintiffs' attempt to distinguish the arrangement settled on between the Salmos, Dietzes and Damas on December 23, 1988 and that ordered by Judge Pearce on January 3, 1989 is, even if valid as a statement of state law, a distinction that is not of constitutional proportions. *See*

Pltf. Brf. dated November 19, 1993 at 45. Under both arrangements James was in the custody of Mrs. Dietz' parents and the Dietzes were to have no unsupervised contact with him. Judge Pearce ordered CWA to oversee the arrangement.

ary 1989, Damas and other CWA staff were entitled to give credence to that source's reports. *See infra* p. 61. The information that CWA received from its Brookdale Hospital source after James' readmission was not reassuring (and the Dietzes apparently failed to notify CWA of the reasons for the readmittance to the hospital).[24] Thus an "unusual situation" that would satisfy the New York statute may well have existed prior to the hearing on January 3, 1989. But this court need not reach this issue, an untested question of state law, for, so long as a hearing was provided within a time frame consistent with federal constitutional standards of due process, no constitutional violation occurred.

### (5)

Every violation of procedure mandated by state law is not a violation of due process protected by the Constitution. *Robison v. Via,* 821 F.2d 913, 923 (2d Cir.1987). *See also Doe v. Connecticut,* 911 F.2d 868, 869 (2d Cir.1990), following *Robison,* granting qualified immunity to Department of Social Service workers who removed a minor child from his parents' home for ninety-six hours "in response to serious allegations of sexual child abuse perpetrated upon the child by his older brother, with the toleration, and perhaps the participation of, the child's parents," even though the removal may have violated state law. The Second Circuit and other federal courts have repeatedly held that justifiable delays in providing a hearing after removing a child in an emergency child abuse situation does not deny constitutionally protected due process to parents. *See* discussion *supra* p. 449.

In terms of qualified immunity for the City individual defendants in connection with the delay in providing a hearing, it is clear that their "conduct [did not] violate clearly established statutory or constitutional rights of which a reasonable person · would have known," the test established in *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), recently cited in *Rodriguez v. City of New York,* 72 F.3d 1065 (2d Cir.1995). Federal precedent discussed above establishes that reasonable delay in providing a hearing does not constitute a denial of constitutional due process where the existence of a child abuse emergency is reasonably perceived. Nor is any federal statute implicated.

Plaintiffs, in their June 14, 1995 brief, argue that, even if there was no violation of a constitutionally protected due process right, "[l]iberty interests may be created by state statutes as well as the Constitution," based on *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), *Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982), *Wright v. Smith,* 21 F.3d 496 (2d Cir.1994) and *Covino v. Vermont,* 933 F.2d 128 (2d Cir.1991). The cases cited by the plaintiffs arise out of confinement situations, largely of prisoners although the doctrine was extended in *Mills* to involuntary and voluntary mental patients confronted with forced administration of anti-psychotic drugs.[25] Establishment of a liberty interest on the basis of state law, even when the doctrine was most in favor, was largely limited to state law regarding conditions of confinement in prisons and other institutions.

However, even in the context of confinement, a few days after plaintiffs completed their brief, this doctrine was substantially restricted by the Supreme Court's decision in

---

**24.** *See supra* p. 438 for a description of the events and conversations relating to the second hospitalization.

**25.** In *Vitek,* for instance, the Court held that a state statute governing procedures under which a prisoner might be transferred to a mental hospital created a liberty interest. In *Mills,* the case was remanded to First Circuit to determine whether a recent decision of the Supreme Judicial Court of Massachusetts, possibly applicable to the matter, had been based on state common law or the federal Constitution. The case had been brought on behalf of the alleged right of

involuntary and voluntary mental patients to refuse anti-psychotic drugs. In *Wright,* New York State regulations, mandating a hearing no later than fourteen days after a prisoner was confined to administrative segregation, was found to create a liberty interest cognizable under 42 U.S.C. § 1983 by a prisoner confined in administrative segregation for sixty-seven days without a hearing. In *Covino,* the Second Circuit remanded the case to the district court to determine if any "mandatory Vermont statute of regulation" applied to a pre-trial detainee held for ninety days in an isolation wing without a hearing, as if so, a liberty interest might have been created.

*Sandin v. Conner,* ——— U.S. ———, 115 S.Ct. 2293, 132 L.Ed.2d 418 (June 19, 1995). The impact of this restriction was noted by the Second Circuit in *Rodriguez v. Phillips,* 66 F.3d 470, 479 (1995): "*Sandin* may be read as calling into question the continuing viability of our cases holding that New York regulations afford inmates a liberty interest in remaining free from administrative segregation," specifically referencing, inter alia, *Wright v. Smith.* The *Sandin* test was summarized by the *Rodriguez* court:

> While acknowledging that states might still create protected liberty interests, the Court stated, "these interests will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

66 F.3d at 479 (quoting *Sandin* at 2300).

Although the court's research has not located an application of *Sandin* in this Circuit outside the context of prison regulation, and has found only two such applications elsewhere,[26] the cases cited by plaintiff in support of such a liberty interest here were also based on prison and involuntary confinement situations.

Here, the deprivation of parental rights was relatively modest. In *Sandin,* the Supreme Court held that a prisoner's solitary confinement for thirty days before a hearing was granted, in violation of state regulations requiring a hearing within fourteen days, did not constitute "a restraint ... impos[ing] atypical and significant hardship on the inmate." ——— U.S. at ———, 115 S.Ct. at 2300. Applying the *Sandin* test to CWA's delay in providing a hearing to the Dietzes in violation of a state law requiring a hearing "forthwith," one must determine whether that delay "impose[d] atypical and significant hardship on the [Dietzes] in relation to the ordinary incidents of ... life." Under this test, the delay of one week from the first day on which a hearing could have been held, Tuesday, December 27, 1988, to Tuesday, January 3, 1989, cannot be found, as a matter of law, to rise to a violation of a state-created liberty interest. The delay actually affected Mr. and Mrs. Dietz' custody of James on only one day that court was in session because of his hospitalization for medical reasons for the remaining days.

As the City's delay in providing an adversarial hearing to Dietzes did not violate the federal constitutional Due Process Clause as applied to the states under the Fourteenth Amendment, and did not violate any state-created liberty interest cognizable under 42 U.S.C. § 1983 and the Fourteenth Amendment, summary judgment on plaintiffs' claim of a due process violation is warranted, not only to City individual defendants Damas, Lewis, Elmore, Grinker, and Trent in their individual capacities on the basis of qualified immunity because the City's actions violated no *established* Constitutional rights, but also to all City individual defendants in all capacities because the delay in providing the hearing violated *no* constitutional rights or state-created liberty interests cognizable under 42 U.S.C. § 1983.

Plaintiffs' other due process arguments are based on their allegations of the falsity of the City's statements and charges at the Family Court hearing on January 3, 1989. These are dealt with *infra* in the analyses of the adequacy of the CWA investigation and the allegation that CWA filed the petition in retaliation for the plaintiffs' having contacted public officials to complain of its conduct.

### 3. The Investigation Conducted by CWA Was Constitutionally Adequate.

#### (1)

 Plaintiffs allege that CWA conducted a constitutionally defective investigation

---

**26.** *W.B. v. Matula,* 67 F.3d 484, 501 (3d Cir. 1995) (*Sandin* cited in action for damages against school officials on behalf of disabled child for the proposition: "Protected liberty interests may arise from either the Constitution or a state statute or regulation," but there, plaintiff's claim was based on federal statute.) and *Danielson v. Chevron Corp.,* 1995 WL 498839 note 4 (N.D.Cal. August 16, 1995) (An applicant for a civil service position challenged City of San Francisco's compliance with its Civil Service Commission Rules, arguing that, inter alia, as an applicant she had a liberty interest in her rank on a civil service list. The court denied that such an interest existed and noted, "[f]urthermore, the recent Supreme Court case of *Sandin v. Conner* ... raises questions as to the strict standards applied to finding a deprivation of a liberty interest based on state law.")

which led it to target Mrs. Dietz as a suspect, citing *BeVier v. Hucal*, 806 F.2d 123 (7th Cir.1986), for this proposition. As with *Hurlman*, plaintiffs demand a great leap on the part of this court in asking it to equate the facts before it with those in *BeVier*. In *BeVier*, the Seventh Circuit refused to overturn a judgment in plaintiffs' favor against the police officer who had arrested them for neglect. The officer found their children, who were under the care of a babysitter, filthy and in direct sun on a 100 degree day. When the parents arrived on the scene, the officer arrested them without questioning them. Although the court agreed that the facts known to the officer weakly supported a finding of neglect, the officer's failure to ask the parents whether they were aware of the situation meant that he had failed to even attempt to determine a necessary element of the crime, knowledge or intent, before arresting them. The court affirmed the district court's holding that the officer "acted unreasonably by failing to investigate the circumstances further ..." 806 F.2d at 126.

In *BeVier*, the court places emphasis on the officer's failure to determine "whether a crime had even taken place." *Id.* at 128. Here there was little question that a crime had been committed. More relevant to the case before this court is the *BeVier* court's citation of *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 442 (7th Cir.1986), for the proposition that "an officer who has established cause on every element of the crime need not continue investigating to check out leads or test the suspect's claim of innocence." *Id.*

### (2)

Plaintiffs point to Damas' lack of knowledge about WSIS, his failure to consult medical and other manuals in his office with regard to WSIS, his failure to personally visit Mrs. McGurn, his failure to interrogate Detective Diggs about the direction of the police investigation, his lack of knowledge with regard to procedures for sharing investigative information between the police and CWA, and his failure to ask Dr. Grillo, the resident who originally treated James at Brookdale Hospital, about the time frame of abuse. Pltf. Brf. dated November 19, 1993 at 55–62.

They also allege he misunderstood Dr. Giridharan's time estimate in their conversation on December 30, 1988 and should have determined the discrepancy (and its relevance) between his and Detective Diggs' notes on the amount of milk that Mrs. McGurn told them James took immediately before he manifested symptoms of WSIS.

Plaintiffs dismiss the presumption of reliability appropriately accorded to the original report of the abuse by a disinterested third party entitled to credence. Further, plaintiffs fail to acknowledge that that reporter was directed to make a report by Dr. Giridharan who was legally obligated to report abuse under N.Y.Soc.Serv.L. § 413(1). More significantly, they also fail to note that Dr. Grillo told Damas he didn't know "anything" about "who did it to child." Damas case notes, City Ex. I. In the criminal justice context, the Seventh Circuit wrote, referring to the credence a police officer was entitled to give the report of a store security guard, surely an analogous relationship to that of a child protection caseworker and a hospital staff member: "A guard is not just any eyewitness. The chance that the complainant is pursuing a grudge, a risk in believing an unknown witness, is small in an institutional setting." *Gramenos v. Jewel Co., Inc.*, 797 F.2d 432, 439 (7th Cir.1986).

Judge Hurley, in *Tenenbaum v. Williams*, explicitly rejected that plaintiff's attempt to apply a criminal "reliable informant" standard to a report of child abuse, ultimately found wholly erroneous, by a professional obligated to report abuse:

> [The reporter] would have no reason to fabricate, or otherwise color the nature of her communications with [the child].... If [reliable informant status] were a precondition to a finding of probable cause in a child abuse case, CWA would be unable to effect an emergency removal even if, for example, a teacher saw a parent commit a particularly heinous sexual act upon his or her child as they entered their home absent some type of independent proof confirming the accuracy of the teacher's re-

port, unless that teacher had prior, and positive, contacts with CWA.

862 F.Supp. 962, 971 (E.D.N.Y.1994).

Here, where the report of abuse was only partially in error, there is even less reason, even in hindsight, to apply such a standard than there was in *Tenenbaum.*

Plaintiffs point to Damas's failure to speak to Det. Diggs and his failing to consider that his and the police investigations could arrive at different conclusions. Pltf. Brf. dated November 19, 1993 at 57, 62. Plaintiffs state: "Damas and Elmore's woefully inadequate investigation of the abuse stands in marked contrast to Det. Nostran Diggs' professional investigation." *Id.* at 61. Damas spoke to Det. Diggs about his investigation on December 28, 1988 and Det. Diggs spoke to Elmore on December 29, 1988. And, in fact, their investigations did not arrive at different conclusions. Detective Diggs also concluded, in this period, that it was impossible to determine who had committed the abusive act, for exactly the reason that Damas did, the inability, based on a discussion with Dr. Giridharan, to narrow the time frame to give one person exclusive opportunity. Detective Diggs concluded his investigation on January 21, 1989 with the statement that "I'm closing this case NON–AMENABLE there is no way to prove that anyone person had Exclusive Opportunity." Pltf. Ex. A. (Emphasis in the original.)

Detective Diggs, as well as Damas, failed to note that Damas and he had received what may be conflicting accounts from Mrs. McGurn about the amount of milk James had taken immediately before he manifested the WSIS symptoms. But nothing had put either investigator on notice that this particular fact would be significant or even useful in determining when the shaking had taken place. No reasonable jury could find the alleged failures of coordination caused any of the alleged constitutional injury to Mr. and Mrs. Dietz or their son.

Plaintiffs' most telling allegation about Damas' investigation, were it supported, is that he misunderstood Dr. Giridharan when he attempted to obtain a time frame for the shaking. However, first, as noted *supra,* plaintiffs fail to acknowledge that it was Dr.

Giridharan who directed the filing of the report of abuse that implicated them. Further, contrary to plaintiffs, there is no material issue of fact that Dr. Giridharan refused to provide, not only to Damas, but also to Detective Diggs, a specific time frame that would exonerate Mr. and Mrs. Dietz in the abuse prior to her March 8, 1989 letter. Dr. Giridharan, herself, testified that she refused to give Damas a time frame with knowledge that her refusal to do so was important. Giridharan at 28–29. Detective Diggs wrote, describing his interview with Dr. Giridharan on December 22, 1988: "The Doctor said it had to of (sic) happened on that day Tuesday but she could not give a time." Pltf. Ex. A.

The distinction between the "few" hours Dr. Giridharan testified to having told Damas and the "several" that Damas recorded simply does not raise a material issue of fact in the face of Dr. Giridharan's confirmation of her refusal to give Damas a specific time frame even though Damas specifically urged its importance to her, especially in view of the corroboration offered by Detective Diggs' report and investigative conclusion. Accepting, as the court must on a summary judgment motion, the non-specific "few" hours that Dr. Giridharan recollected saying at her deposition in 1992, more than three years after the conversation, rather than Damas' contemporary notes of the estimation "several," does not dictate another outcome to the CWA investigation in late December 1988 in view of Dr. Giridharan's acknowledgment that she refused to specify the time frame when specifically asked by Damas.

Moreover, Damas' failure to determine that his and Det. Diggs' investigation reports contained inconsistencies as to Mrs. McGurn's statement about the amount of milk that James had drunk was not a constitutional violation. Both Damas and Detective Diggs reasonably relied on Dr. Giridharan for medical advice. Plaintiffs have provided no evidence to support the proposition that either the detective or Damas should have known that this information was critical. As plaintiffs point out, Damas was not trained about WSIS. Dr. Giridharan was a pediatric neurologist who had treated many WSIS victims and, even more impor-

tantly, was treating James Dietz when both Detective Diggs and Damas spoke to her. Dr. Giridharan did not inform anyone that such information would be important in determining the culprit. Giridharan at 11–12.

As noted above, the analogy of *BeVier v. Hucal*, 806 F.2d 123 (7th Cir.1986), to this case, urged by plaintiffs, is not compelling. *See* Pltf. Brf. dated November 19, 1993 at 55. The circumstances in *BeVier* involved *criminal* arrest of parents for a crime that required at least awareness, without inquiry as to their possessing that awareness, after the children had been removed to hospital and were in no danger, and against the advice of the child protection agency representative. Damas' failure to locate a discrepancy in McGurn's statements that would exonerate the parents from suspicion was not a failure to establish that a crime had been committed.

The court in *BeVier* did not question the propriety of the state's assumption of custody of the children, upon their being found in what was reasonably believed to be a state of neglect. The *BeVier* court acknowledged that an officer was not obligated to "check out leads or test the suspect's claim of innocence." *Id.* at 128. Yet that is exactly what the plaintiffs fault Damas for failing to do.

In this case, CWA was not pursuing criminal charges, but, in many ways, a far starker problem, requiring the highest assurance that an erroneous decision was not being made, since a mistake could be fatal to a child, already severely injured. An erroneous criminal accusation, while serious, would invoke a wrongful deprivation of liberty but not life. If there was to be error, it must be in favor of protection of the child. The issue faced by Damas and CWA here was whether an abused child should be returned to the unrestricted custody of his parents without assurance that no additional abuse would occur.

The threshold issue in determining whether the investigation violated any constitutional rights of the plaintiffs is whether, if the investigation had been conducted differently, the petition would not have been filed in Family Court. Plaintiffs have introduced no material issue of fact, in view of Dr. Giridhar-

an's testimony and Detective Diggs' report, from which any inference may be drawn that correction of any of the faults they perceive in Damas' investigation would have resulted in the exoneration of Mr. and Mrs. Dietz at this period. Plaintiffs' lavish praise for Det. Diggs' investigation, which reached the same conclusion as Damas', reinforces this conclusion. There is no ground for drawing the inference plaintiffs allege, that Damas conducted an incompetent and constitutionally inadequate investigation of the Dietzes. Thus, summary judgment for all City individual defendants in all capacities is warranted on plaintiffs' second cause of action, alleging constitutional violations from an allegedly incompetent investigation.

**4. The Family Court Petition Was Based on Probable Cause and Did Not Chill the Dietzes' Exercise of Their First Amendment Rights. Thus They Cannot Establish that the Prosecution was Constitutionally Malicious.**

(1)

Plaintiffs have alleged that the City individual defendants filed the petition against them in retaliation for their having sought to bring political pressure to bear, and thereby violated their First Amendment rights to petition for redress of grievances. The standard for retaliatory or malicious prosecution requires the plaintiff to establish the lack of probable cause for the prosecution and "that the state prosecution terminated in his favor," *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir.1995), in order to overcome the otherwise conclusive effect of judicial confirmation of the prosecutor's action. *See also, Hygh v. Jacobs*, 961 F.2d 359, 367 (2d Cir.1992). When the claim alleges that the prosecution was in retaliation for exercise of First Amendment rights and probable cause for the prosecution is established, plaintiffs must also allege that the retaliation was effective in chilling their exercise of their rights. *Singer* at 120.

To meet this burden, the Second Circuit requires more than conclusory statements that a jury *may* draw an inference of malice as the motive for the prosecution. "It is . . .

insufficient to merely plead facts upon which an inference of retaliatory prosecution may be drawn.... [I]f the officer either had probable cause or was qualifiedly immune from subsequent suit (due to an objectively reasonable belief that he had probable cause), then we will not examine the officer's underlying motive in arresting and charging the plaintiff." *Id.* at 120. The facts in *Singer* are far more supportive of an inference of retaliatory motive than those before the court here. The plaintiff in *Singer* had published a newspaper highly critical of the local police and the store he alleged they frequented to an excessive extent. He was prosecuted for theft of several items of food from that store, for which he, a park ranger, had given the cashier a detailed receipt, explaining that he was taking the food to an emergency rescue effort. Nonetheless, the court held that the plaintiff failed to assert a viable First Amendment claim, both because the officer had probable cause for the arrest as the store had not consented to the ranger's actions and because the arrest did not chill plaintiff's exercise of his First Amendment rights. After the arrest, the plaintiff continued to publish his newspaper.

The effort to silence criticism must be effective to constitute a constitutional deprivation that overcomes the deference given to prosecutions based on probable cause. " 'An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause that is in reality an unsuccessful attempt to deter or silence criticism of the government.' " *Id.,* (quoting *Mozzochi v. Borden,* 959 F.2d 1174, 1179–80 (2d Cir.1992)). In *Mozzochi,* too, the court held that "because there were reasonable grounds for the defendant to believe that probable cause existed, the defendant was entitled to qualified immunity." 959 F.2d at 1179.

### (2)

The plaintiffs' actions in contacting public officials to request their assistance in resolving their entanglement with CWA come within the First Amendment's protection of the right "to petition the Government for a redress of grievances." CWA's decision to file a petition against the Dietzes was made subsequent to the calls to CWA staff from a City Councilman's office and from a member of the staff of the Human Rights Commission. However, to establish malicious prosecution in violation of their First Amendment rights, plaintiffs must either establish the lack of probable cause for the prosecution and the termination of the court proceedings in their favor or, if probable cause has been established for the prosecution, they must establish that the prosecution *actually* chilled their exercise of their First Amendment rights. *See Singer v. Fulton County Sheriff,* 63 F.3d at 117–18, 120, discussed supra at p. 457–58.

Plaintiffs cannot establish *any* of these requisites. As the above analysis indicates, based on the information available before Dr. Giridharan narrowed the time frame in which the abuse could occur in her March 8, 1989 letter, probable cause existed to limit Mr. and Mrs. Dietz' custody of James. The outcome of the hearing in Family Court, on January 3, 1989, confirmed the existence of probable cause that James had been severely injured as the result of abuse and that probable cause existed for suspecting Mr. and Mrs. Dietz in the abuse.

The final outcome of the Family Court proceeding was not termination in Mr. and Mrs. Dietz' favor, however, but rather, on June 8, 1989, the petition was withdrawn without prejudice with three months continued supervision. Expungement of the child abuse report in 1992 does not alter this outcome. As a result, even drawing the inferences suggested by plaintiffs that the prosecution was in retaliation for their exercise of their First Amendment rights and that Damas and Elmore knowingly permitted the erroneous allegations of the original abuse report to be repeated in the Family Court petition, the existence of probable cause means that there is no material issue of fact preventing the grant of summary judgment. Plaintiffs have pointed to no evidence but have only made conclusory allegations that the actions of Damas, Elmore and Lewis were not conducted in good faith. As discussed above, their actions were objectively reasonable under the emergency child abuse

situation presented and they did not violate plaintiffs' rights under the Constitution.

Furthermore, the prosecution did not chill Mr. and Mrs. Dietz' exercise of their First Amendment rights. Mr. and Mrs. Dietz and their representative effectively contested the petition, made the court aware of the errors in the petition, and, according to plaintiffs, obtained thereby a reduction in the limits on their custody from those CWA requested.

Thus, summary judgment is granted to all City individual defendants on plaintiffs' claim of retaliatory prosecution, their third cause of action, as no constitutional violation has been established.

### 5. Qualified Immunity for Individual City Defendants and Plaintiffs' Lack of Standing to Assert *Monell* Policy and Practice Claims.

#### (1)

■ In the alternative to the foregoing analysis under which summary judgment has been granted with respect to all of plaintiffs' federal claims, the City individual defendants have requested a ruling with respect to their entitlement to the affirmative defense of qualified immunity.[27] The individual City defendants, Damas, Elmore, Lewis, Grinker and Trent, have been sued in both personal and official capacities.

The Second Circuit, in *Mozzochi v. Borden*, 959 F.2d 1174, 1178 (2d Cir.1992), outlined the analysis a court should undertake with regard to qualified immunity defenses on a motion for summary judgment: "a court should ask whether, viewing the evidence in the light most favorable to the non-moving party, the conduct that may be proved at trial is conduct that, at the time it occurred, violated a clearly established, constitutional or statutory right." If the outcome of the analysis is that no such right was violated, in the alternative, no clearly established right was violated and summary judgment should

be granted on the basis of qualified immunity.

And, if no constitutional right was violated by defendants' conduct, as held here, there is no federal basis for plaintiffs to undertake an inquiry as to the City's custom and practice. As noted above, violation of state law, without more, does not state a claim under 42 U.S.C. § 1983. *See Doe v. Connecticut*, 911 F.2d 868 (2d Cir.1990) and the discussion of *Robison v. Via*, 821 F.2d 913 (2d Cir.1987), *supra* p. 444. Thus all individual City defendants are entitled to qualified immunity.

#### (2)

The individual City defendants had varying involvement in the events underlying this claim. In particular, plaintiffs have presented no evidence of any personal involvement on the part of defendants Grinker and Trent. As a result, as a further alternative, they are entitled to summary judgment in their individual capacities on the basis of their lack of personal involvement. Plaintiffs have produced no "concrete evidence" that would rebut the defendants' evidence identifying Gene Skarin, not a named defendant, as the plaintiffs' contact at HRA headquarters *and* the person from headquarters who contacted the legal unit about the case. Mere speculation by the non-movant that Grinker and Trent were involved because Skarin was involved is not sufficient to defeat summary judgment.

#### (3)

■ The City cannot be held liable for the acts of its agents under a theory of respondeat superior. The relevant part of § 1983 provides:

[e]very person who, under color of any statute, ordinance, regulation, custom or usage of any State …, subjects or causes to be subjected, any citizen … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

27. The City also asserted the affirmative defense of absolute immunity in its answer, but has not further argued this, perhaps in recognition that the weight of the case law is against such a position. Qualified immunity has been extended to child protection caseworkers but absolute immunity has been denied to all except government attorneys in their litigating roles in connection with initiating and prosecuting child protection litigation. *Robison v. Via*, 821 F.2d 913, 920 (2d Cir.1987).

To state a § 1983 claim against the City, plaintiffs must allege a specific policy or custom of the municipality which deprived the plaintiff of a federal constitutional right. *Monell v. Dep't of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) ("a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom whether made by its lawmakers or those [who] . . . represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."); *Dwares v. City of New York,* 985 F.2d 94 (2d Cir.1993); *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 122 (2d Cir.1991); *East Coast Novelty Co., Inc. v. City of New York,* 781 F.Supp. 999 (S.D.N.Y.1992).

■■■ Suit against Grinker and Trent (as well as the other City individual defendants) in their official capacities is equivalent to suit against the City and is subject to the *Monell* requirements. "Qualified immunity is not a defense to a claim against a municipal official in his official capacity." *Frank v. Relin,* 1 F.3d 1317, 1327 (2d Cir.1993). Nonetheless, "[b]ecause the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's policy or custom must have played a part in the violation of federal law.'" *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991) (quoting *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978))).

However, the determinative factor here is that, having established no violations of their rights cognizable under 42 U.S.C. § 1983, plaintiffs have no standing to raise *Monell* claims of City policy and practice in violation of such rights. *See Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984), *City of Los Angeles v. Lyons,* 461 U.S. 95, 105–106, 103 S.Ct. 1660, 1666–67, 75 L.Ed.2d 675 (1983). Thus summary judgment is granted with respect to all of plaintiffs' federal claims against the City and the individual City defendants in official capacity.

## Conclusion

How the State is to balance the rights of parents vis-a-vis the need to protect children at risk is a question initially for the State Legislature. Unless the Constitution gives greater weight to parental rights than the case law to date grants, the actions of the City here were appropriate, reflecting in this case a sensitive balancing of preservation of parental contact with protection of the child. While the State is, of course, free to require greater proof before its officials may interfere in parental custody, for federal courts to require more would risk leaving the State without any ability within the law to balance these interests and, perhaps, leave it unable to protect children.

This court cannot find any violation of Constitution by the individual City defendants in the events underlying this case. Plaintiffs have failed to show any genuine issues as to any material fact from which an inference might be drawn that the "hold" and other restrictions placed on James' custody were not warranted by an objectively reasonable belief that an emergency existed, that Damas' investigation was constitutionally inadequate or that the actions of Damas, Elmore and Lewis were not undertaken in good faith.

Plaintiffs have provided only conclusory allegations of malicious motive (or any involvement at all) on the part of Damas and Elmore in the errors in the child abuse petition filed on January 3, 1989 or in undertaking the child abuse proceeding. Further, even if such motive did exist, because the child abuse petition was based on probable cause and did not chill Mr. and Mrs. Dietz' exercise of their First Amendment rights, it would not establish a constitutional violation.

Thus, the individual City defendants' motion for summary judgment is granted on the plaintiffs' federal claims, the first, second, third, and fifth causes of action, for constitutional violations and violations of state law cognizable under 42 U.S.C. § 1983. Having suffered no constitutional or other violation cognizable under 42 U.S.C. § 1983 at the hands of the City's agents in any capacity, plaintiffs have no standing to bring a *Monell* claim against the City directly. Thus the

causes of action against the City must also be dismissed. As noted above, the plaintiffs have withdrawn their fourth cause of action.

 Having dismissed the plaintiffs' 42 U.S.C. § 1983 claims, the court dismisses their supplemental state law claims as well. Although this court has discretion to hear the state claims arising out of "a common nucleus of operative fact" under its supplemental jurisdiction, *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725–28, 86 S.Ct. 1130, 1138–40, 16 L.Ed.2d 218 (1966), in view of the arguments made by plaintiffs concerning state law, Pltf. Brf. 28–32, and the real possibility that such claims depend on novel questions of state law, retention of these claims in federal court is inappropriate. *See Robison v. Via*, 821 F.2d at 925: "Where the federal claim must be dismissed it may be an abuse of the district court's discretion to take pendent jurisdiction of a claim that depends on novel questions of state law." Accordingly, the court, having found no triable issue of fact that there was any violation of federal law in the City and City individual defendants' conduct toward plaintiffs, declines to retain jurisdiction over plaintiffs' remaining causes of action that arise under state law against the City, the individual City defendants and Defendant McGurn, pursuant to 28 U.S.C. § 1367(c)(1) & (3).

The Court also declines to retain jurisdiction over defendant McGurn's counter-claim against Mr. and Mrs. Dietz, for which jurisdiction depends on supplemental jurisdiction under 28 U.S.C. § 1367(a).

The Clerk of the Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

## Appendix A

Calendar of events from hospitalization to Family Court hearing.

| DATE | DAY of WEEK | JAMES' STATUS & CWA ACTIVITY |
| --- | --- | --- |
| December 20, 1988 | Tuesday | James injured, treated at Lutheran Hospital, transferred to Brookdale Hospital. |
| December 21, 1988 | Wednesday | Whiplash shaken infant syndrome (WSIS) diagnosed. Dr. Giridharan requests that abuse report be filed. |
| December 22, 1988 | Thursday | Abuse reported to state, from State to City–CWS. Hold placed on James. Damas spoke to Dr. Grillo, resident treating James, tried and failed to see Mr. & Mrs. Dietz at their home and left a 555C form notifying them of abuse report. Det. Diggs interviewed Dr. Giridharan who told him that the shaking occurred sometime on Tuesday, but that she could not give a time. |
| December 23, 1988 | Friday | Damas met with Mr. & Mrs. Dietz and the Salmos at the Salmos' home in evening. Agreement reached that James to be released under the Salmos' supervision. Mr. Salmo informed Damas that Det. Diggs of 70th Pct handling case. |
| December 24, 1988 | Saturday—Weekend | James discharged under the Salmos' supervision. Mr. & Mrs. Dietz stay with him at Salmos' house. |
| December 25, 1988 | Sunday—Weekend | Christmas—an important holiday for Mr. and Mrs. Dietz and the Salmos. |
| December 26, 1988 | Monday—Holiday | James to hospital for check-up. Appointment made for rehospitalization on 12/28/88. |
| December 27, 1988 | Tuesday | James at Salmos with Mr. & Mrs. Dietz. Damas spoke to McGurn, called but did not speak to Det. Diggs. |
| December 28, 1988 | Wednesday | James readmitted to hospital for bulging fontanel, has spinal tap. Mrs. McGurn called Damas to complain that Mrs. Salmo called to accuse her of hurting James. |

| DATE | DAY of WEEK | JAMES' STATUS & CWA ACTIVITY |
|---|---|---|
| | | Original reporter of abuse, but not Dietzes or Salmos, notified Damas of James readmission. Damas spoke to Det. Diggs who told Damas he was unable to determine who abused James. Damas unable to reach Dr. Giridharan. Damas called Mr. Salmo, requested that he keep Damas informed. |
| December 29, 1988 | Thursday | James in hospital. Mr. & Mrs. Dietz with him. First record of calls made on behalf of Mr. & Mrs. Dietz from a staff member of the Human Rts Comm. responding to a call from a City Council member and then from a staff member of a City Council member. Elmore noted call from Det. Diggs to advise him of the "pressure brought to affect the outcome of this case." |
| December 30, 1988 | Friday | James had another spinal tap. Damas spoke to Dr. Giridharan who refuses to set time frame that would eliminate Mr. & Mrs. Dietz as abuser. Damas left message for Det. Diggs. CWA placed new "hold" on James. Damas conferred with Zone Director Fenton, and his supervisor, Elmore. Fenton directed that diagnosis should be changed to Battered Child Syndrome. Damas reported that Elmore did call Dr. Giridharan but she would not change diagnosis. |
| December 31, 1988 | Saturday—Weekend | James in hospital, possibly ready for discharge. |
| January 1, 1989 | Sunday—Weekend | James in hospital, possibly ready for discharge |
| January 2, 1989 | Monday—Holiday | James in hospital, possibly ready for discharge |
| January 3, 1989 | Tuesday | Family Court hearing, James placed in custody of Salmos. Neither Damas nor Elmore involved in preparation of Family Court petition. Not clear whether Damas nor Elmore were at work this day although plaintiffs allege that they have documents dated and signed by them on that date. James discharged from hospital to the custody of the Salmos. |